1  PATRICK MORGAN FORD
   Law Office of Patrick Morgan Ford
2  1901 First Avenue, Suite 400
   San Diego, CA 92101
3
   SBN 114398
4  619 236-0679

5  Attorney for Petitioner
   ANTONIO MICHAEL VITALE
6

7

8

9

10

**FILED**

'08 FEB 21 PM 12: 49

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _Rm_  DEPUTY

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  ANTONIO MICHAEL VITALE,          )
                                     )   '08 CV 0331 JLS WMc
12          Petitioner,              )
                                     )   **MEMORANDUM OF LAW
13  vs.                              )   IN SUPPORT OF PETITION
                                     )   FOR WRIT OF HABEAS
14  JAMES TILTON, Secretary, California )  CORPUS BY A PERSON
    Department of Corrections and Rehabilitation, ) IN STATE CUSTODY
15                                    )   (28 USC 2254)**
            Respondent.              )
16  _____ )

17                            **Introduction**

18          Petitioner Antonio Michael Vitale has, by and through his retained counsel, Patrick

19  Morgan Ford,  filed with this court a Petition for Writ of Habeas Corpus by a Person in

20  State Custody, pursuant to 28 USC 2254.

21          Petitioner, having been convicted in the San Diego County Superior Court of

22  several counts of sexual assault and one count of drug possession, was sentenced to an

23  indeterminate state prison term of 42 years-to-life.  Petitioner alleges his conviction and

24  imprisonment contravenes the Due Process Clause of the Fourteenth Amendment and

25  asserts three errors of constitutional magnitude.

26  //

27

28

1

**Topical Index**

2   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

3   Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

4   Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

6   Argument

7   I.     There was insufficient evidence as to a lack of consent
        to sustain the convictions for forcible rape and forcible
8          oral copulation as to either of the  prostitute victims.  . . . . . . . . . . . . . . . . . . . .

9   II.    The trial court denied petitioner due process of law and
        deprived him of a fair trial by refusing the defense request to
10         give an instruction under *People v. Mayberry* regarding
        a defendant's mistaken, but good faith belief that the
11         complainants consented to the sexual acts.  . . . . . . . . . . . . . . . . . . . . . . . . . . . .

12  III.   The trial court denied petitioner a fair trial by
        admitting an irrelevant and highly inflammatory
13         video tape of appellant engaging in consensual sexual
        conduct with a prostitute in Thailand.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

14

15  Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

16  Declaration of Service  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

17

18

19

20

21

22

23

24

25

26

27

28

**Table of Authorities**

*Cases*

*Brecht v. Abrahamson*
    (1993) 507 U.S. 619 [123 L.Ed.2d 353, 113 S.Ct 1710 . . . . . . . . . . . . . . . 9

*Estelle v. McGuire*
    (1991) 502 U.S. 62   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*In re Winship*
    (1970) 397 U.S. 358 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Jackson v. Virginia*
    (1979) 443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 15

*Michelson v. United States*
    (1948) 335 U.S. 469 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Old Chief v. United States*
    (1997) 519 U.S. 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*O'Neal v. McAninch*
    (1995) 513 U.S. 432 [130 L.Ed.2d 947, 115 S.Ct 992] . . . . . . . . . . . . . . . 9

*Payne v. Tennessee*
    (1991) 501 U.S. 808 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Spencer v. Texas*
    (1967) 385 U.S. 554, 572-574   . . . . . . . . . . . . . . . . . . . . . . . . 26

*Williams v. Taylor*
    (2000) 529 U.S. 362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Bradley v. Duncan*
    (9th Cir. 2002) 315 F.3d 1091 . . . . . . . . . . . . . . . . . . . . . . . . 20

*Calderon v. Coleman*
    (1998) 525 U.S, 141 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Chaney v. Lewis*
    (9th Cir. 1986) 801 F.2d 1191, 1194 . . . . . . . . . . . . . . . . . . . . . . 9

*Duckett v. Godinez*
    (9th Circuit 1995) 67 F.3d 734 . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re John Z.*
    (2003) 29 Cal.4th 756 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re Jose P.*
    (2005) 131 Cal.App.4th 110 . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*In re Romero C.*
    (1995) 33 Cal.App.4th 1838 . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1   *Jones v. Woods*
        (9th Cir. 1997) 114 F.3d 1002, 1013 . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

2

3   *MacFarlane v. Walter*
        (9th Cir. 1999) 179 F.3d 1131, 1139-40 . . . . . . . . . . . . . . . . . . . . . . . 9

4   *McKinney v. Rees*
        (9th Cir. 1993) 993 F.2d 1378 . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

5

6   *People v. Babbitt*
        (1988) 45 Cal.3d 660 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

7   *People v. Balcom*
        (1994) 7 Cal.4th 414 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8

9   *People v. Bermudez*
        (1984) 157 Cal.App.3d 619 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10  *People v. Bradbury*
        (1907) 151 Cal. 675 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

11

12  *People v. Branch*
        (2001) 91 Cal.App.4th 274 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

13  *People v. Carmen*
        (1959) 36 Cal.2d 768 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

14

15  *People v. Castillo*
        (1987) 193 Cal.App.3d 125 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

16  *People v. Falsetta*
        (1999) 21 Cal.4th 903 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

17

18  *People v. Fitch*
        (1997) 55 Cal.App.4th 172 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

19  *People v. Flannel*
        (1979) 25 Cal.3d 668 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

20

21  *People v. Garceau*
        (1993) 6 Cal.4th 140 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

22  *People v. Johnson*
        (1980) 26 Cal.3d 557 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

23

24  *People v. Kipp*
        (1998) 18 Cal.4th 349 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25  *People v. Kitt*
        (1978) 83 Cal.App.3d 834 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26

27  *People v. May*
        (1989) 213 Cal.App.3d 118 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28  *People v. Mayberry*

*(1975) 15 Cal.3d 143* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 20

*People v. Modesto*
    (1963) 59 Cal.2d 722 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*People v. Reilly*
    (1970) 3 Cal.3d 421 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*People v. Roundtree*
    (2000) 77 Cal.App.4th 846 . . . . . . . . . . . . . . . . . . . . . . . . 13

*People v. St. Martin*
    (1970) 1 Cal.3d 524 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Tassell*
    (1984) 36 Cal.3d 77 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Toledo*
    (1948) 85 Cal.App.2d 577 . . . . . . . . . . . . . . . . . . . . . . . . 18

*People v. Wickersham*
    (1982) 32 Cal.3d 307 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*People v. Williams*
    (1992) 4 Cal.4th 354 . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*People v. Wright*
    (1988) 45 Cal.3d 1126 . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*People v. Young*
    (1987) 190 Cal.App.3d 248 . . . . . . . . . . . . . . . . . . . . . . . . 14

*Standen v. Wiley*
    (9th Cir. 1993) 994 F2d 1417 . . . . . . . . . . . . . . . . . . . . . . . 9

*Tyson v. Trigg*
    (7th Cir. 1995) 50 F.3d 436 . . . . . . . . . . . . . . . . . . . . . . . . 20

*Statutes*

Evidence Code
    section 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    section 1108 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21-24, 26
    section 1108 subd. (d)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . 23
    section 1108 subd.(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    section 1108, subd.(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    section 210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    section 350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    section 351 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    section 352 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Penal Code
    section 261 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    section 261.6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    section 288a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    section 647 subd.(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

United States Constitution
    Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . 10, 16, 20, 21, 26
    Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

Other Authorities
    CALJIC No. 1.23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    CALJIC No. 10.65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-18

1

2          **UNITED STATES DISTRICT COURT**

3      **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

4

5   ANTONIO MICHAEL VITALE,                    )        Case No._____
                              Petitioner,      )
6                                              )        **MEMORANDUM OF LAW**
            vs.                                )        **IN SUPPORT OF PETITION**
7                                              )        **FOR WRIT OF HABEAS**
    JAMES TILTON, Secretary, California        )        **CORPUS BY A PERSON**
8   Department of Corrections and Rehabilitation, )     **IN STATE CUSTODY**
                                               )        **(28 USC 2254)**
9   _____Respondent.       )

10                        **Statement of the Facts**

11          In that petitioner's first argument concerns the insufficiency of the evidence to

12   support the sexual assault charges, he sets forth here a detailed statement of facts, with

13   references to the state court record.

14                             *Prosecution's Case*

15          In the Spring of 2003, V.S. was 16 years-old and working as a prostitute along El

16   Cajon Boulevard in San Diego. (RT 33.)  She started working as a prostitute when she

17   was 11 years-old. (RT 33.) She stopped from February, 2001, through March, 2003, while

18   she lived in Las Vegas.  (RT 35.)

19          Sometime during May through July, 2003, she was sexually assaulted by one of

20   her customers.  (RT 33.)  She cannot be sure, but believes the incident may have occurred

21   closer to June.  (RT 89.)  At the time, she was living in local motels.  (RT 89.)

22          It was nearly dark one evening as she was walking across a bridge on El Cajon

23   Boulevard when a man, later identified as petitioner, drove up and asked her if she

24   wanted a ride. (RT 36.)  She replied, "No," but gave petitioner a smile.  (RT 36.)  He

25   parked at a nearby gas station and she got in his car.  (RT 37.)  She asked if he was a

26   police officer and he told her, "No." (RT 37.)  To prove this, petitioner pulled his penis

27   out of his pants and V.S. touched it, satisfying herself that petitioner was not a police

28   officer. (RT 37.)

                                        1

1    Petitioner asked her how old she was, and she replied "20." (RT 38.) He asked if
2  she was certain, because he would pay her more if she was younger. (RT 38.) She then
3  told petitioner that she was 16 years-old. (RT 38.) Petitioner told her he wanted oral sex,
4  intercourse, and to pull her hair and spank her "lightly." (RT 38.) V.S. viewed this as
5  "unusual." (RT 38.) She agreed to go with petitioner in his car. (RT 89.) They
6  apparently agreed on a price, yet when petitioner pulled onto the nearby freeway V.S.
7  became alarmed and told petitioner she did not want to leave the El Cajon Boulevard
8  area. (RT 39, 41.)

9    Petitioner told her his name was Tony and V.S. gave her "working name" as
10  "Champagne." (RT 40.) He asked if she had ever been molested as a child and she told
11  him that she had. (RT 40.) She agreed to oral sex, intercourse and having her hair pulled,
12  but cannot recall whether she also agreed to be "paddled." (RT 90.) She could not recall
13  the price to which they had agreed. (RT 41.) At some point, they stopped at an ATM and
14  petitioner appeared to withdraw money. (RT 44.)

15    Petitioner told her he had a four year-old daughter. (RT 43.) He also said he
16  wanted her to do "something unusual," and there was a name he wanted her to call him,
17  but would not yet tell her what it was. (RT 44.) He parked his car in the garage at his
18  apartment building and they walked across an alley. (RT 45.) As they entered his
19  apartment petitioner, referring to her earlier statement that she had been molested as a
20  little girl, asked her, "Do you mean to tell me some lucky man got to have that ass at 12
21  years old?" (RT 41.) Once they were inside petitioner's apartment, he told her the name
22  he wanted her to call him was "pedophile." (RT 48.) She asked if he was proud of being
23  a pedophile and he told her he was. (RT 48.) He pushed her inside the apartment and
24  told her she must answer him, "Yes, pedophile. No, pedophile." (RT 48.)

25    Petitioner sat on the living room couch, refused to apply a condom, and told her to
26  "suck his dick." (RT 48.) She complied and shortly thereafter tasted urine. (RT 48.) She
27  said, "You're peeing!" (RT 48.) He asked her if she could handle that and she told him
28  she could not. (RT 48.) At some point she removed her clothes. (RT 48.)

2

1    He then pushed her on the floor and penetrated her vaginally. (RT 49.)  He pulled

2  out and urinated on her. (RT 49.)  She began to vomit and he told her, "Good girl.  I'll

3  pay you more." (RT 49.)  He placed her on the bed, "doggie style," and she felt him hit

4  her across the buttocks, twice, with a paddle. (RT 49.)

5    He rubbed Vaseline on her buttocks to ease the pain, then placed her in a shower

6  enclosure and began to call her a "12 year-old whore." (RT 50.)  He had earlier told her

7  that he wanted her to pretend that she was 12 years-old again. (RT 50.)  He took her back

8  in the living room and had intercourse with her in different positions. (RT 50.)  Petitioner

9  also told her that he had a friend with a 10 year-old daughter, and that he would pay his

10  friend to have sex with his daughter. (RT 51.)

11    When petitioner told her to orally copulate him, she was "compliant," and offered

12  no resistance. (RT 52.)  When she started choking and vomiting, petitioner told her,

13  "Good girl. Keep doing that, you know how to please me.  I'll pay you more." (RT 55.)

14    There were additional sex acts after petitioner spanked her with the paddle. (RT

15  60.)  These acts were "against her will," in that she testified she did not want to be there

16  at that point, but she did not resist or attempt to stop petitioner. (RT 60.)  Petitioner

17  placed money on a table or speaker box in the living room. (RT 61.)  When they were

18  leaving the apartment, V.S. repeatedly asked for her money. (RT 61.)  Petitioner replied

19  that he had already paid her with the money that was on the table. (RT 61.)

20    When they entered petitioner's car, he told her that he was a vice cop and they

21  were targeting underage prostitutes. (RT 63.)  She exited the car and walked through the

22  apartment complex, towards the front gate. (RT 63.)  Petitioner was behind her, asking

23  where she was going. (RT 63.)  He told her to sit on some stairs and began asking her

24  real name and age. (RT 64.)   She got up and ran across the street behind a liquor store.

25  (RT 64.) Once there, she accepted a ride from a man to a nearby convenience store. (RT

26  64.)  V.S. then telephoned a friend, Chris Larkin, to pick her up, which he did. (RT 67.)

27  She did not notify the police because she was an underage runaway, and believed police

28  would laugh at her when they found out she was a prostitute. (RT 69.)  She also said that

1  she did not report the incident as "I put myself in that predicament." (RT 111.)

2  The following day, V.S. described the incident to her sister, who was also a

3  prostitute. (RT 70.) Approximately three weeks later, she saw petitioner in his car on

4  Main Street in El Cajon. (RT 70.) He apparently did not recognize her as he stopped and

5  asked her if she wanted a ride. (RT 70.) V.S. told petitioner, "You're fucking sick," and

6  tried to get his license plate number. (RT 70.) She never did report the matter to police,

7  but instead revealed it later during an interview with police regarding the investigation of

8  prostitution occurring at private parties. (RT 84, 274.) This was in November, 2003, and

9  she was further interviewed in January, 2004. (RT 108, 275.)

10  At the preliminary examination, she stated, "It wasn't, obviously, all that serious

11  because I didn't rush down to the police department and try to look for him. But when

12  the chance came about yes, of course I had to report it." (RT 111.)

13  The "M.W." incident

14  Nineteen year-old M.W. was living in Florida when she testified. (RT 134.) She

15  said that when she was 16 years-old she met a pimp named "A.J." in South Beach, and

16  starting prostituting for him. (RT 135.) He drove her to San Diego in the Spring of 2003.

17  (RT 136.)

18  On the evening of May 23, 2003, she was working on El Cajon Boulevard. (RT

19  136.) Petitioner drove up in a Honda Civic. (RT 136.) She had only been in San Diego

20  for perhaps a week. (RT 137.) Petitioner offered to pay her $300 to spank him with a

21  paddle. (RT 138.) When she got into the car with petitioner, she told him she was 20

22  years-old. (RT 139.) He showed her $300. (RT 139.) On the ride to his apartment, he

23  told her about the paddling, and she went along willingly. (RT 139.) On cross-

24  examination she stated that she only agreed to the paddling for $300, but stated earlier,

25  and at the preliminary examination, that she "assumed" she would also be having sex with

26  petitioner. (RT 169.)

27  Once inside his apartment, petitioner told her that he was a vice cop and she could

28  either do what he wanted or he would take her to jail. (RT 141.) At this point she began

4

1    "mild sobbing." (RT 142.) Petitioner never threatened her or displayed any type of

2    weapon. (RT 143.) She became afraid because petitioner had "a look on his face." (RT

3    143.) He told her to keep saying that she was only 15 years-old. (RT 143.) She later

4    testified that she knew right away that petitioner was lying when he told her he was a

5    police officer. (RT 174, 224, 226, 232.)

6         She removed her shirt and began to orally copulate petitioner. (RT 144.) He then

7    had her lay on the floor and told her he would ejaculate on her chest. (RT 144.)

8    Petitioner orally copulated her, engaged in intercourse, and then ejaculated on her chest.

9    (RT 144, 232.) At the preliminary examination, she testified that petitioner did not orally

10    copulate her. (RT 172.) Even though she cried at various times, she never indicated that

11    she resisted, told petitioner to stop, or that she wanted to leave. (RT 147.) She then stated

12    that she at some point "may have" told petitioner that she no longer wanted to engage in

13    sex, but she could not be sure. (RT 148.) Petitioner never used or threatened her with

14    physical force. (RT 171.) She willing removed her clothes. (RT 171.) While they were

15    having sex, petitioner "treated her like she was his girlfriend." (RT 148.) Petitioner gave

16    her some paper towels to clean herself, then she got dressed. (RT 149.)

17         She left the apartment, and ran through the garage area. (RT 149.) When she got

18    to the street, she saw some people in a Volkswagen van at an intersection and told them

19    she had been raped. (RT 150.) She pointed toward petitioner, who had followed her to

20    the street and said he had raped her. (RT 201.) Petitioner told the woman, in a very

21    sarcastic tone, "Yeah, I raped her." (RT 208, 211, 343.) She used her cell phone to call

22    her pimp, and informed him what happened. (RT 150.) She declined an offer by the

23    people in the van to drive her out of the area. (RT 183.) When the woman in the van told

24    her they should call police, "She absolutely refused." (RT 205.) M.W. told her she did

25    not want the police to be called. (RT 205.) The woman in the van took the cell phone

26    away from M.W., and told the person on the other end of the line that this girl had been

27    raped or violated in some way and that they needed to notify the police. (RT 205.) The

28    man told her not to telephone the police. (RT 205.) When she insisted, the man told her,

1  "Shut up, you fucking bitch. Get off the phone. Leave her alone." (RT 206.) He

2  continued to call her names and told her to "Stay out of this. Let me talk to her. Leave

3  her alone." (RT 207.) M.W. then told the woman told her to leave her alone. (RT 207.)

4  M.W. then gathered her belongings and walked across the street to a liquor store. (RT

5  207.) The woman and her husband drove to a nearby McDonalds and used a pay phone to

6  call the police. (RT 208.)

7        When police arrived they talked with M.W. and observed semen on her neck. (RT

8  152.) She gave police the false name of "Reyna Chanyet." (RT 152.) She also lied to

9  police by telling them that she was at Hotel Circle when a man pulled up in a car and told

10  her he was a bail bondsman. (RT 153.) The man told her she looked like someone he

11  was looking for, then grabbed her and pulled her into his car. (RT 153.) She did not tell

12  them she was working as a prostitute. (RT 153.) She agreed to a partial examination at a

13  hospital. (RT 152.) She permitted the SART nurse to swab her neck and chest and gave

14  a urine sample, but refused to give blood or submit to a pelvic examination. (RT 156,

15  308.) The nurse found two scratches on her back, but no bruising. (RT 320.)

16        She returned to Florida and was contacted by the San Diego District Attorney's

17  office in October, 2004. (RT 164, 218.) She was living with her grandmother, who did

18  not know that she was a prostitute, but rather thought of her as a "little angel." (RT 163.)

19        The police arrived on scene the evening of May 23, 2003. (RT 237.) Using

20  M.W.'s statements, the police obtained a search warrant and searched petitioner's

21  residence. (RT 238.) They observed a paddle and some soiled paper towels in the living

22  room. (RT 239, 286.) They seized these items. (RT 240.) Petitioner was not home, but

23  later contacted the detectives by telephone. (RT 241.) Subsequently, they obtained a

24  warrant was to secure a DNA sample from petitioner. (RT 242.) Petitioner's DNA

25  matched that found on M.W.'s neck and chest, as well as that found in the paper towels

26  taken from his apartment. (RT 357, 362.) A homemade video depicting petitioner having

27  sex with a Thai prostitute and slapping her was also seized.

28        A former co-worker testified that petitioner stayed at her apartment for a few days,

1  starting on May 24, 2004. (RT 268.)

2      On March 3, 2004, Detective Vile received a telephone call from petitioner. (RT

3  326.) The call was recorded. (RT 327.) A redacted version of that telephone call, over

4  an hour in length, was played for the jury, and a written transcript provided. (RT 330;

5  Exhibit 18; CT 166.) Petitioner discussed the charged offenses, which he claimed were

6  entirely consensual acts to which both prostitutes had agreed, and further claimed that the

7  scene depicted on the Thai video was also consensual.

8  *The Defense case*

9      The defense insisted that all charged acts with the prostitutes were consensual and

10  part of an agreement.

11      Petitioner's neighbor, a former rape counselor, testified that she saw petitioner

12  walking through the garage area one evening in May, 2003. (RT 392, 395.) Petitioner

13  was with a young woman – presumably, M.W. (RT 393, 395.) She stated that the woman

14  did not appear to be under any duress. (RT 396.) She recalled the incident because the

15  police came to petitioner's apartment later that night. (RT 397.)

16      A detective, who took the initial report from M.W. on May 23, 2003, recalled her

17  statements to him that evening, including the many lies she told. RT 404.) She lied about

18  her name, being kidnapped earlier that evening in Mission Valley, and being forcibly

19  raped in petitioner's apartment. (RT 404.)

20  **Standard of Review**

21      Under the provisions of the Anti-terrorism and Effective Death Penalty Act of

22  1996, in order to obtain habeas corpus relief a petitioner must demonstrate that the state

23  court decision challenged is contrary to, or involved an unreasonable application of,

24  clearly established federal law as determined by the United States Supreme Court. (28

25  U.S.C. section 2254(d)(1) and (2); *Williams v. Taylor,* 529 U.S. 362, 405-406 (2000));

26  *Early v. Packer*, 537 U.S. 3, 7-8 (2002); *MacFarlane v. Walter,* 179 F.3d 1131, 1139-40

27  (9th Cir. 1999).)

28      The only definitive source of clearly established federal law under AEDPA is,

7

1    collectively, the decisions of the United States Supreme Court as of the time of the state

2    court decision. (*Williams v. Taylor, supra,* 529 U.S. 405, 413.)

3        Factual findings by the state court are generally presumed correct and the

4    petitioner has the burden of rebutting this presumption by clear and convincing evidence.

5    (28 U.S.C. section 2254(e)(1).)

6        In order to prevail, a petitioner must show that federal constitutional errors in the

7    trial court had a substantial and injurious effect or influence in determining the jury's

8    verdict, and resulted in actual prejudice. (*Brecht v. Abrahamson,* 507 U.S. 619 (1993);

9    *Standen v. Wiley,* 994 F2d 1417 (9th Cir. 1993).) "Trial errors" are judged under the

10   standard just stated; "structural defects" or errors that affect the integrity of the entire

11   trial process, require automatic reversal; deliberate and egregious errors, or trial errors

12   that are combined with a pattern of prosecutorial misconduct, may require reversal

13   even if they do not substantially affect the verdict. (*Id.*) It is the state's burden to

14   show that any error(s) had no such effect; any doubt must be resolved in favor of the

15   petitioner. (*O'Neal v. McAninch,* 513 U.S. 432 (1995).

16                                  **Argument**

17                                    **I**

18          **There was insufficient evidence as to a lack of consent**
            **to sustain the convictions for forcible rape and**

19             **forcible oral copulation as to either victim.**

20                              *Background*

21        Petitioner was convicted of three counts of forcible rape and four counts of

22   forcible oral copulation. The jury found petitioner not guilty of the kidnapping for rape

23   count, and rejected kidnap enhancement allegations.

24        The sole issue in this case was whether the prostitutes consented to the sexual

25   intercourse and oral copulation. The two incidents have been described in detail in the

26   Statement of Facts.

27                             *Applicable Law*

28        The Due Process clause of the Fourteenth Amendment requires that a conviction

1  be supported by substantial evidence. "The relevant question is whether, after viewing the

2  evidence in the light most favorable to the prosecution, any rational trier of fact could

3  have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v.*

4  *Virginia* (1979) 443 U.S. 307, 319; *People v. Johnson* (1980) 26 Cal.3d 557, 576.)

5
> The test on appeal is whether substantial evidence supports the
> conclusion of the trier of fact, not the whether the evidence proves guilt
6
> beyond a reasonable doubt. [Citation omitted.] The appellate court must
> determine whether a reasonable trier of fact could have found the
7
> prosecution sustained its burden of proving the defendant guilty beyond
> a reasonable doubt.
8

9  (*People v. Reilly* (1970) 3 Cal.3d 421, 425, quoted in *People v. Johnson, supra,* 26 Cal.3d

10  557, 576.)

11  "Evidence," to be "substantial" must be "of ponderable legal significance . . .

12  reasonable in nature, credible, and of solid value." (*Ibid.*)

13  Penal Code section 261 states:

14
> (a) Rape is in act of sexual intercourse accomplished with a
> person not the spouse of perpetrator, under any of the following
> circumstances:
15
>               * * *
> (2) Where it is accomplished against a person's will by means
16
> of force, violence, duress, menace, or fear of immediate and unlawful
> bodily injury on the person of another.
17

18  Penal Code section 288a holds:

19
> (a) Oral copulation is the act of copulating the mouth of one person
> with the sexual organ or anus of another person.
20
>               * * *
21
> (c)(2) Any person who commits an act of oral copulation when the
22
> act is accomplished against the victim's will by means of force, violence,
> duress, menace, or fear of immediate and unlawful bodily injury on the
23
> victim or another person shall be punished by imprisonment in the
> state prison for three, six, or eight years.

24  "Consent," in relation to sex offenses, is defined as "positive cooperation in an act

25  or attitude as an exercise of free will. The person must act freely and voluntarily and

26  have knowledge of the nature of the act or transaction involved." (CALJIC No. 1.23.1;

27  Penal Code section 261.6)

28  //

1

2                                  *Legal Analysis*

3                          <u>Counts involving "V.S."</u>

4          It was charged that petitioner twice forcibly raped V.S., and committed two acts of

5  forcible oral copulation upon her. (CT 52.)  However, her testimony shows that no force,

6  violence or duress was employed by petitioner, nor did she in anyway communicate to

7  petitioner that she was withdrawing her consent, once it was given.

8          V.S. freely admitted that, at the time she was approached by petitioner, she was

9  working as a prostitute, selling sex for money. (RT 33.)  When she entered his car she

10  asked if he was a police officer, and when he denied this, she had him expose his penis so

11  she could touch it. (RT 37.)  Petitioner told her he wanted oral sex, intercourse, and to

12  spank her. (RT 38.)  She agreed to perform these acts. (RT 90.)  They agreed on a price

13  and she agreed to go with petitioner. (RT 89.)  Once inside his apartment he told her to

14  "suck his dick," and she willingly complied. (RT 48.)  She had removed her own clothes

15  at this time. (RT 48.)  It is clear that all the acts were consensual up until this time.

16          While orally copulating petitioner, V.S. tasted urine. (RT 48.)  She told petitioner

17  she could not handle that and he stopped, then pushed her on the floor and penetrated her.

18  (RT 48, 49.)  When he "pulled out" of her and urinated on her she began to vomit. (RT

19  49.)  He told her, "Good girl. I"ll pay you more." (RT 49.)  He placed her on the bed and

20  twice spanked her buttocks with a paddle. (RT 49.)

21          After placing her in a shower, he took her back to the living room and had

22  intercourse with her in different positions. (RT 50.)

23          Nowhere in her testimony did V.S. ever indicate that she told petitioner to stop,

24  either during intercourse or oral copulation.  She never stated that she resisted or

25  otherwise communicated to petitioner that she was withdrawing her consent.  Other than

26  spanking her with a paddle as previously agreed upon, petitioner never struck her or used

27  any force, violence or threats.

28          Instead, V.S. claimed that after the paddling, the sex acts were "against her will" in

                                          10

1  that she no longer wanted to be there, but never said or did anything to communicate this

2  to petitioner.  (RT 60.)

3      After the sex acts were completed, both V.S. and petitioner left the apartment and

4  entered his car.  (RT 63.)  Once there, petitioner told her he was a vice cop and they were

5  targeting underage prostitutes.  (RT 63.)  This, however, occurred *after* completion of the

6  sex acts.

Counts Involving "M.W."

8      M.W. also admitted that she was a working  prostitute on May 23, 2003, when she

9  encountered petitioner on El Cajon Boulevard.  (RT 136.)  Petitioner offered her $300 to

10 spank him with a paddle.  (RT 138.)  She agreed to do this and willingly accompanied

11 petitioner.  (RT 139, 140.)  While she only expressly agreed to the paddling, she conceded

12 that she "assumed" she would also be having sex with petitioner for the $300.  (RT 169.)

13     Once inside petitioner's apartment, he told her he was a vice cop and she had to do

14 as he said,  or he would take her to jail.  (RT 141.)  While this upset M.W., she quickly

15 realized that petitioner was not a police officer.  (RT 174, 224, 226, 232.)  Instead, she

16 complied with petitioner's requests because of "a look on his face."  (RT 143.)  She

17 removed her own shirt  and orally copulated petitioner.  (RT 144.)  She willingly removed

18 her clothes.  (RT 171.)  He had her lay on the floor and told her he was going to ejaculate

19 on her chest.  (RT 144.)  Petitioner then orally copulated her, engaged in intercourse, and

20 ejaculated on her body.  (RT 144, 232.)

21     She never resisted or told petitioner that she wanted to leave, and petitioner never

22 threatened her or used any type of violence.  (RT 147, 171.)  Instead, while they were

23 having sex, petitioner "treated her like she was his girlfriend."  (RT 148.)  She testified

24 that she "may have," at some point, told petitioner that she no longer wanted to have sex,

25 but could not be sure of this.  (RT 148.)

26     After the sex acts were completed, she walked out of the apartment, ran through

27 the garage and across the street, where she encountered some people in a van and told

28 them she had been raped. (RT 149, 201.)  She refused to call the police and instead

11

1  telephoned her pimp. (RT 150, 205, 206.)  When the police arrived she lied to them, gave

2  them a false name and told them she had been in Mission Valley where she was forcibly

3  kidnapped by petitioner, taken to his apartment and raped. (RT 152, 153.)

4                                   Consent

5          Both prostitutes willingly agreed to accompany petitioner to his apartment and

6  engage in various sex acts in exchange for money.  That is what prostitutes do.

7          Petitioner acknowledges that it is possible for a woman, even a prostitute to

8  consent to sex, and then, at some point, withdraw that consent.  In California, if the man

9  fails to comply with the woman's request to stop, he is then guilty of forcible rape, oral

10 copulation or another act. (*In re John Z.* (2003) 29 Cal.4th 756, 760;  *People v.*

11 *Roundtree* (2000) 77 Cal.App.4th 846, 850.)

12          In both *In re John Z.* and *People v. Roundtree,* the victims made very clear to the

13 defendants that they wanted to stop the intercourse. (*In re John Z.,* 29 Cal.4th at 758;

14 *Roundtree,* 77 Cal.App.4th at 848.)  That is *not* the case here as to either alleged victim.

15 V.S. testified that the sex acts committed after the consensual paddling were "against her

16 will," but she never communicated this to petitioner by word or deed.  Likewise, M.W. at

17 first started "sobbing mildly" after petitioner told her he was a vice officer, but then

18 admitted she quickly discounted petitioner's claim, and engaged in various sex acts

19 without resistance or any indication to petitioner that she wanted to stop or leave.  Even if

20 M.W. had engaged in sex with petitioner based on his claim that he was a police officer

21 who would otherwise arrest her, this does not constitute forcible rape unless she had a

22 "reasonable belief that the perpetrator is a public official." (Penal Code section 261 subd.

23 (7).)  M.W. specifically testified that she immediately disbelieved petitioner's claim that

24 he was a police officer who would arrest her.

25          Consent, once given, cannot be withdrawn if the "withdrawal" takes place only in

26 the mind of the woman engaging in sex.  There *must* be something more than "a look" on

27 the man's face, or some other vague and ambiguous claim regarding the withdrawal of

28 consent.  A conviction for forcible rape, cannot be sustained without evidence that the

1    defendant threatened bodily harm, or said or did *something* to induce reasonable fear in

2    the victim. Moreover, the victim must convey her fear to the defendant (*People v. Young*

3    (1987) 190 Cal.App.3d 248.) In *Young*, the court noted that

4         Although resistance is no longer the touchstone of the element
          of force, the reviewing court still looks to the circumstances of the

5         case, including the presence of verbal or nonverbal threats, or the kind
          of force that might reasonably induce fear in the mind of the victim,

6         to ascertain sufficiency of the evidence of a conviction under section 261,
          subdivision (2). (*See People v. Bermudez* (1984) 157 Cal.App.3d 619,

7         624.; *People v. Hunt, supra.*, 72 Cal.App.3d at p. 194; cf. *People v.
          Bradbury* (1907) 151 Cal. 675, 677 ....) Additionally, the complainant's

8         conduct must be measured against the degree of force manifested or in
          light of whether her fears were genuine and reasonably grounded.

9    (*Id.* at 256.)

10

11   A court recently addressed the issue of the withdrawal of consent in *In re Jose*

12   *P.* (2005) 131 Cal.App.4th 110. In that case, the court found that, even though the victim

13   willingly engaged in foreplay, there was sufficient evidence that she later withdrew her

14   consent to any further sexual activity, and thereafter affirmed the forcible rape conviction.

15   The court noted that the victim "made it clear to petitioner, repeatedly and prior to

16   penetration, both that she did not want to be penetrated and that petitioner's efforts were

17   both against her will and physically painful to her."( *Id.* at 117.)  That case logically

18   describes the parameters for the withdrawal of consent, and strengthens petitioner's

19   argument in the present case.

20        Where a prostitute voluntarily agrees to engage in sex acts for money, then later

21   claims her will was overcome and the acts therefore "became" involuntary, the law must

22   demand that there be *some* evidence of a clear, unambiguous indication to the customer

23   that she demanded he stop and he refused to do so.  Neither V.S. nor M.W. made any

24   such demand to petitioner.

25        The record shows the prostitutes agreed to have intercourse and oral copulation.

26   While some of the other acts were unpleasant, there was no evidence that the women

27   withdrew their consent – certainly not as to the intercourse and oral copulation, of which

28   petitioner was convicted.

13

1      Based on the Fourteenth Amendment, a federal habeas corpus court must consider

2  not whether there is *any* evidence to support a state-court conviction, but whether there

3  was sufficient evidence to satisfy a rational trier of fact to find guilt beyond a reasonable

4  doubt. (*Jackson v. Virginia, supra,* 443 U.S. 307, 313-316, citing *In re Winship*, 397 U.S.

5  358 (1970).) Applying that standard to the sexual assault charges of which petitioner was

6  convicted, it is clear those charges are *not* supported by sufficient evidence that the

7  prostitutes at some point during the sexual activities withdrew their prior to consent to

8  engage in this conduct for pay, and made the cancellation of their contract known to

9  petitioner.  The state courts failed to apply the proper standard in a reasonable manner.

10  Habeas corpus relief must be granted.

## II

**The trial court denied petitioner due process of law and
deprived him of a fair trial by refusing the defense request to
give an instruction under *People v. Mayberry* regarding
a defendant's mistaken, but good faith belief that the
complainants consented to the sexual acts.**

### Background

17     Based upon the ambiguous testimony of both prostitutes regarding their alleged

18  withdrawal of consent, and petitioner's statements in his telephone interview with the

19  detective that they consented to all the sexual acts he performed, the defense requested

20  that the court give the so-called *Mayberry* instruction found in CALJIC No. 10.65.  (RT

21  375.)  The court refused to give the instruction, mis-citing the testimony of the prostitutes

22  by stating that each of them had indicated they became fearful and withdrew their consent

23  to any further sex acts.  (RT 380.)

### Applicable Law

25     "It is well-settled that in criminal cases, even in the absence of a request, the trial

26  court must instruct on the general principles of law relevant to the issues raised by the

27  evidence. The general principles of law governing a case are those principles closely and

28  openly connected with the facts before the court, and which are necessary for the jury's

1   understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)  The

2   requirement of *sua sponte* instructions arises from the defendant's constitutional right

3   (under the Sixth and Fourteenth Amendments) to have the jury determine every material

4   issue presented by the evidence, as well as the jury's "truth acertainment function."

5   (*People v. Wickersham* (1982) 32 Cal.3d 307, 335; *People v. Barton* (1995) 12 Cal.4th

6   186, 196; see also *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).)

7        In *People v. Mayberry* (1975) 15 Cal.3d 143, the California Supreme Court held

8   that there is no rape if a defendant maintains a reasonable, although mistaken belief that a

9   prosecutrix voluntarily consented to engage in sex. (*Id.* at 156.)  Accordingly, the jury

10  must be so instructed where there is evidence that may raise a reasonable doubt as to

11  whether the defendant believed the complaining witness consented to the sex acts

12  charged.  (*Id.* at 157.)

13       CALJIC No. 10.65 reads:

14       In the crime of [unlawful] [forcible rape] [oral copulation by
         force and threats] . . . criminal intent must exist at the time of the
15       commission of the [crime charged]. There is no criminal intent if
         the defendant had a reasonable and good faith belief that the other
16       person voluntarily consented to engage in [the acts]. Therefore, a
         reasonable and good faith belief that there was voluntary consent
17       is a defense to such a charge.

18       [However, a belief that is based upon ambiguous conduct
         by the alleged victim that is the product of force, violence, duress,
19       menace, or fear of immediate and unlawful bodily injury on the
         person or another is not a reasonable good faith belief.]
20
         If after consideration of all the evidence you have a
21       reasonable doubt that the defendant had criminal intent at the time
         of the [sex acts], you must find him not guilty of the crime.
22

23       A defendant is entitled to instructions, upon request that highlight his theory of the

24  case as long as the requested instruction addresses a legal point rather than specific facts,

25  and is not argumentative or duplicative of other instructions. (*People v. Wright* (1988) 45

26  Cal.3d 1126, 1135.)  If the evidence warrants it, CALJIC No. 10.65 must be given *sua*

27  *sponte*. (*People v. Castillo* (1987) 193 Cal.App.3d 125-126.)

28       In *People v. Flannel* (1979) 25 Cal.3d 668, the court, commenting on the duty to

                                              15

1  provide requested instructions, found the trial court should instruct the jury on "every

2  material question upon which there is *any evidence* deserving of any consideration

3  whatever." (*Id.* at 684, quoting *People v. Carmen* (1959) 36 Cal.2d 768, 773 (emphasis

4  added).) "The fact that evidence may not be of a character to inspire belief does not

5  authorize the refusal of an instruction based thereon.  That is a question within the

6  exclusive province of the jury." (*Ibid.*)

7         If the defendant proffers evidence enough to deserve consideration by the jury, i.e.,

8  evidence from which reasonable jurors could have concluded the substance of the

9  instructions is true, the court must so instruct. (*Ibid.*)  "A trial court should not, however,

10  measure the substantiality of the evidence by undertaking to weigh the credibility of the

11  witness, a task exclusively relegated to the jury." (*Ibid.*)  Moreover, doubts as to the

12  sufficiency of the evidence to warrant requested instructions should be resolved in favor

13  of the accused. (*Id.* at 685.)

14                                    *Legal Analysis*

15         The prosecution's case here consisted of two prostitutes, both of whom testified

16  that they went to petitioner's apartment willingly in order to engage in agreed upon sex

17  acts in exchange for money.  Both stated that at some point they became afraid of

18  petitioner, or wanted to stop  because of petitioner's behavior or comments, or "the look

19  on his face."  Both stated that petitioner never displayed any type of weapon, never made

20  any overt or implied threats and never used force, except for the agreed upon spanking of

21  V.S.  Neither stated that she ever told petitioner she wanted to stop or made any other

22  express indication to this effect.  In his telephonic conversation with Detective Vile,

23  petitioner stated that the acts he committed with both prostitutes were consensual and part

24  of their arrangement.[1]

25

26  _____

27         [1] In *People v. Toledo* (1948) 85 Cal.App.2d 577, the court found the evidence was

28  insufficient to support a manslaughter conviction where the only evidence of defendant's

1  One can hardly imagine a more appropriate set of facts for the of CALJIC No.

2  10.65 instruction.   If the evidence is conflicting on the issue of consent, or a good faith

3  belief in consent, the court must give this instruction.  (*People v. Williams* (1992) 4

4  Cal.4th 354, 360.)

5  The case law strongly supports this position.  In a prosecution for forcible oral

6  copulation and, by logical extension, forcible rape, in which the defendant alleges that the

7  victim was a prostitute and that what transpired them was nothing more than sex-for-

8  money transactions, the trial court had a *sua sponte* duty to give this instruction.  (*People*

9  *v. May* (1989) 213 Cal.App.3d 118, 124.  See similarly, *People v. Williams, supra,* 4

10  Cal.4th 354, 359.)  And this remains true even if the defendant did not rely upon such a

11  defense, as long as the instruction was supported by substantial evidence.  (*Ibid.*)

12  In this case, it was uncontested that both complaining witnesses were working

13  prostitutes.  Both stated they initially agreed to the sex acts, but subsequently wanted to

14  stop and leave, although they never expressed this to petitioner by deed or word.

15  There are two components to the *Mayberry* defense.  The first is a subjective one,

16  asking whether the defendant honestly, albeit mistakenly, believed the victim consented

17  to the sexual activity.  (*People v. Williams, supra,*  4 Cal.4th 354, 360.)  On this point, the

18  defendant must adduce evidence of the victim's equivocal conduct on which he

19

20  participation in the killing came from his own extrajudicial statements to police, and in

21

22  those statements he described the attack as justified by self-defense.  The court ruled that,

23  absent contrary evidence, the prosecution was bound by the exculpatory evidence it

24  presented.  (*Id.* at 581-582.)  Here, the prosecution introduced petitioner's recorded

25

26  statement to Detective Vile in which petitioner made the uncontradicted claims that the

27  acts with the prostitutes and depicted in the Thai video were all consensual. The

28  prosecution should have been bound by these exculpatory claims.

17

1  erroneously believed their was consent. (*Ibid.*) Here, both victims testified they

2  expressly consented to the sex acts in exchange for money. The second component is an

3  objective one, which asks whether defendant's mistake regarding consent was reasonable

4  under the circumstances. (*Ibid.*) In this case, the question is whether it was reasonable

5  for petitioner to *continue* to believe that the prostitutes were consenting to the acts he

6  performed.

7       Petitioner met both prongs of the standard for requesting the *Mayberry* instruction

8  and it was error for the court to refuse that request.

9       Petitioner was entitled to this instruction as a matter of due process of law.

10  (*Duncan v. Louisiana, supra*, 391 U.S. 145, 149.)

11  *The error was prejudicial*

12       The only issue in this case was whether the prostitutes withdrew their previous

13  consent to engage in sex acts with petitioner. The jury could have found in petitioner's

14  favor by finding either that the prostitutes consented and did not adequately make known

15  to petitioner that they were withdrawing their consent at some point or, perhaps even

16  more reasonable, that the alleged efforts at withdrawing consent were so ineffectual

17  petitioner may well have continued to believe, even if mistakenly, they never made such a

18  withdrawal and his acts were entirely voluntary pursuant to their previous agreement. By

19  refusing the *Mayberry* instruction, the court removed one half of the defense.

20       In *People v. Modesto* (1963) 59 Cal.2d 722, 730, we held that
    "[a] defendant has a constitutional right to have the jury determine

21  every material issue presented by the evidence. Regardless of how
    overwhelming the evidence of guilt may be, the denial of such a

22  fundamental right cannot be cured by article VI, section 4 ½ [now 13],
    of the California Constitution, for the denial of such a right itself is a

23  miscarriage of justice within the meaning of that provision."

24  (*People v. Mayberry, supra*, 15 Cal.3d at 157.)

25       Petitioner contends the error here is of constitutional magnitude. An important

26  aspect of the Sixth Amendment right to make a defense is the right to have the jury

27  instructed on the defense. For even if a defendant is allowed to present all admissible

28  evidence supporting his defense, this is meaningless unless the jury is given instructions

18

1  which explain the nature and significance of the defense.  As one court put it, the right to

2  present witnesses in support of the defense "would be empty if it did not entail the further

3  right to an instruction that allowed the jury to consider the defense." (*Tyson v. Trigg* (7[th]

4  Cir. 1995) 50 F.3d 436, 448.)  It is a violation of a defendant's Fourteenth Amendment

5  right to due process right to present a full defense for the trial court to fail to instruct on

6  such a defense. (*Bradley v. Duncan* (9th Cir. 2002) 315 F.3d 1091, 1098-1099.) The error

7  was so fundamental it deprived petitioner of a fair trial. (*Duckett v. Godinez*, 67 F.3d 734,

8  743  (9th Cir. 1995); *Calderon v. Coleman*, 525 U.S, 141 (1998).)

9

10                                          **III**

11              **The trial court denied petitioner a fair trial by**
              **admitting a irrelevant and highly inflammatory**
12              **video tape of petitioner engaged in consensual**
              **sexual conduct with a prostitute in Thailand.**
13

14                                      *Background*

15          Police searched petitioner's residence on February 10, 2004, and seized a video

16  tape which depicted petitioner engaging in various sexual activities with a young Asian

17  woman – perhaps in her early twenties. (RT 288, 290.)  Petitioner's passport reflected

18  that he had traveled to Thailand from the middle of December, 2003, to the middle of

19  January, 2004. (RT 287.) Over defense objection, the tape (designated as People's Exhibit

20  20), and a Thai-to-English transcript were admitted under Evidence Code section 1108.

21  (RT 299.)

22          Petitioner contends that the tape was inadmissible under the Due Process clause of

23  the Fourteenth Amendment.

24          The tape begins with petitioner and the young woman, conceded to be a prostitute,

25  on a bed in what appears to be a hotel room.  Both are unclothed. From the surroundings

26  and other scenes on the tape, this appears to take place in Thailand.

27          Petitioner is first shown shaving the pubic area of the woman.  He stops for a

28  moment and slaps the woman on the side of her face.  He tells her, "look, look."  She

                                          19

1    starts crying and he tells her, "Good girl." She is seen holding the side of her face and

2    asking petitioner not to hit her. He assures her, and tells her "Good girl."

3        Petitioner sits on the edge of the bed and has the woman kneel down on the floor

4    in front of him. He tells her to "suck" and she orally copulates him. After a few minutes,

5    he is seen holding the back of her head, forcing his penis all the way into her mouth. She

6    begins to gag. Petitioner is heard encouraging her, telling her that she is pleasing him by

7    doing so. He tells her to vomit. Petitioner is heard to say "Yes," approximately 10 times.

8    Petitioner places the woman on the bed, out of the view of the camera. He tells her,

9    "Open your mouth," and choking sounds are heard. Petitioner again encourages the

10   woman. A few minutes later, the woman is seen getting off the bed and petitioner

11   eventually does the same.

12       Petitioner objected to the admission of the tape as being highly

13   inflammatory and not meeting the requirements of either Evidence Code section 1101 or

14   1108. The objections were overruled. (RT 12, 299.)

15       *Applicable Law*

16       For evidence to be admissible, it must be relevant to some issue in dispute.

17   (Evidence Code sections 210, 350; *People v. Garceau* (1993) 6 Cal.4th 140, 177; *In re*

18   *Romero C.* (1995) 33 Cal.App.4th 1838, 1843.)

19       Even relevant evidence may be excluded for policy or constitutional reasons, such

20   as hearsay, undue prejudice or foundational requirements. (Evidence Code section 351.)

21       In a criminal action in which the defendant is charged with a sex offense, evidence

22   of a defendant's commission of another sex offense, even if never charged, may be

23   admissible in order to show the defendant's propensity to commit a similar act.

24   (Evidence Code section 1108, subd. (a).)

25       Admission of evidence in a state court trial violates due process where it renders

26   the trial fundamentally unfair. (*Estelle v. McGuire*, 502 U.S. 62 (1991).)

27       *Legal Analysis*

28       Evidence Code section 1108

1    The court found that the video tape was admissible under Evidence Code section

2    1108 "for the purpose of consent and modus operandi and the ability of the jury to

3    evaluate the testimony of the complaining witnesses . . ." (RT 14.) The court later ruled

4    that "fear" was the "common thread" which linked the acts in the Thai video to those

5    charged. (RT 260.)

6    Initially, the evidence was inadmissible as it did not meet the criteria of section

7    1108, which holds that in a prosecution for a sexual offense, evidence of the defendant's

8    commission of another sexual offense is not made inadmissible by Evidence Code section

9    1101. (Evidence Code section 1108, subd. (a).) A "'sexual offense' means a crime under

10   the law of a state or of the United States that involved any of the following . . ." (Section

11   1108 subd. (d)(1).) Subdivision (d)(1)(A) sets forth various sex offense Penal Code

12   sections, including forcible rape and forcible oral copulation.

13   The video tape admitted in this case depicts petitioner engaged in sexual activities

14   with a prostitute in Thailand. The prosecution presented no evidence that prostitution is

15   unlawful in Thailand. In fact, legal prostitution is the reason many people visit Thailand.

16   Moreover, section 1108 subd. (d)(1)(A) sets forth the sex offenses which may serve as the

17   basis for admissibility, yet the prostitution statute in California, Penal Code section 647

18   subd. (b), is not included. Petitioner's prior "offense" did not fall within the purview of

19   section 1108 and should not have been admitted. (*Cf. People v. Branch* (2001) 91

20   Cal.App.4th 274, 280 [both the prior uncharged offense and current offense were those

21   listed in section 1108 subd.(d)(1)(A)].)

22   Furthermore, the jury received no instruction that it should make such a

23   determination as to consent, prior to utilizing this evidence under section 1108. Any

24   argument that the tape was admissible under this subsection is therefore waived as

25   involving factual issues not resolved below.

26   Next, the court stated that it was admitting this evidence under section 1108 on the

27   issues of consent and modus operandi. However, the tape was completely irrelevant to the

28   issue of consent. The court focused its analysis on the fact that petitioner had slapped the

1  woman in the video. (RT 12.)  Again, we have no evidence that this was not part of the

2  arrangement between petitioner and the prostitute, and therefore consensual. Noteworthy

3  here is that the alleged victim, V.S., indicated that in addition to sex, her agreement with

4  petitioner included being hit and his pulling her hair.

5     Even assuming, *arguendo*, that the slap was nonconsensual, it still has no

6  relevance to the question of consent in the charged offenses.  There was absolutely no

7  evidence that petitioner used any type of violence or threats of violence towards the

8  complaining witnesses in order to overcome their free will to commit the acts they

9  performed.  Any evidence of physical force demonstrated by the tape was completely

10  irrelevant to the question of consent in the instant case.  Evidence, in order to be

11  admissible, must be relevant to some disputed fact.  (Evidence Code section 350; *People*

12  *v. Babbitt* (1988) 45 Cal.3d 660, 681.)  "There is no discretion vested in a court to admit

13  irrelevant evidence." (*People v. Kitt* (1978) 83 Cal.App.3d 834, 849.)

                          Evidence Code section 352

15     The admission of the tape also violated Evidence Code section 352 in that its

16  probative value, if any, was far outweighed by the prejudicial effect on the jury of seeing

17  petitioner slap the woman in the video while engaged in consensual sexual conduct.

18     The overriding factor emphasized by the California Supreme Court in finding that

19  Evidence Code section 1108 did not violate due process of law, was the "safeguard" that

20  the courts would be required to first review the uncharged offense under Evidence Code

21  section 352. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917, citing *People v. Fitch* (1997)

22  55 Cal.App.4th 172, 183.)

23     Under section 352, a trial court must determine whether the probative value of the

24  proffered evidence outweighs any prejudicial effect such evidence may have on the jury.

25  (*Ibid.*; *People v. Falsetta, supra*, 21 Cal.4th 903, 917; *People v. Hawkins, supra*,  98

26  Cal.App.4th 1428, 1444.)

27     When dealing with uncharged offenses, the probative value must be substantial

28  and must not be outweighed by the danger that the jury will be unduly prejudiced by

                                  22

1  hearing such evidence. (*People v. Kipp* (1998) 18 Cal.4th 349, 371.) When faced with

2  prior conduct which did not result in a conviction, the court must consider whether the

3  jury may be "tempted to convict defendant of the charged offenses, regardless of his guilt,

4  in order to assure that he would be punished for the uncharged offenses." (*People v.*

5  *Balcom* (1994) 7 Cal.4th 414, 427, cited with approval in *People v. Falsetta, supra,* 21

6  Cal.4th at 917.)

7      The trial court in the present case was not concerned with the fact that the prior

8  "offense" involved petitioner engaged in consensual sexual activity with a prostitute in

9  Thailand. Rather, the court focused on the fact that petitioner slapped the woman during

10  the encounter.

11          The Court: And, also, I'd like to make a record that when I saw the
            reaction of the victim, it was clear to me, and I don't know that a witness
12          could take – Detective Vile or any other witness who saw that film could
            take an oath and say, "Well, let me tell you what I saw," because it was
13          indescribable, the fear, the horror that was on the face of the Taiwanese
            [sic] girl, presumably Taiwanese [sic], whatever girl she was, but the
14          message was clear: She was terrified, and she was shocked that she got
            slapped on the left side of her face by the defendant, who hit her hard.
15

            And there was a whole bunch of nonconsentual [sic], noncapitalistic
16          [sic] behavior. It wasn't money for sex. It wasn't money for sex. If it
            was money for sex, you know, that's an old profession, you know
17          practiced for a long time, you know. Money for sex doesn't bother me a bit.
            I don't know what the problem would be if it was money for sex. I'm not
18          sure it would be admitted. I don't think it would. So a guy pays for
            sex, so what.
19  (RT 12.)

20      Earlier, the court acknowledged the highly prejudicial nature of this video:

21          The Court: And there is no doubt that there is a prejudicial
            effect, and there is no doubt that the event on that Thai film might
22          create an emotional response. I think it would in any sensitive person,
            it would.
23

24  (RT 3.)

25      The court nonetheless believed a jury could follow the instructions regarding the

26  evidence. (RT 3.)

27      The prosecution believed the video was not unduly prejudicial because "we saw no

28  blood; we saw no torture; we saw no weapons being used." (RT 11.)

1    The probative value of the video was marginal, at best. Moreover, the court

2  emphasized highly inflammatory nature of the video. The court therefore abused its

3  discretion in admitting this evidence and thereby deprived petitioner of his right to a fair

4  trial. Such "other crimes evidence" violates due process when it is, as here, probative

5  only of a defendant's character and criminal propensity, and when the jury could have

6  drawn no permissible inferences from the evidence. (*McKinney v. Rees* , 993 F.2d 1378,

7  1384 (9th Cir. 1993).)

8                     Evidence Code section 1108 Violates Due Process

9    Petitioner submits that Evidence Code section 1108 violates the Due Process

10  clause of the Fourteenth Amendment in that it permits the admission of evidence that is

11  so unduly prejudicial that it renders a trial fundamentally unfair. (*Payne v. Tennessee*

12  (1991) 501 U.S. 808. 825.) Moreover, admission of this evidence reduces the

13  prosecution's burden of proof. (See e.g., *People v. Garceau, supra,* 6 Cal.4th 140, 186.)

14    Petitioner further asserts the argument on federal due process grounds. (See e.g.,

15  *Spencer v. Texas,* 385 U.S. 554, 572-574 (1967) (Warren, C.J., concurring and

16  dissenting); *Old Chief v. United States,* 519 U.S. 172 (1997); *Michelson v. United States,*

17  335 U.S. 469, 475-476 (1948); and, *McKinney v. Rees, supra,* 993 F.2d 1378, 1380-1381.

18  See also, *People v. Tassell* (1984) 36 Cal.3d 77, 84.)

19                     The error in admitting the evidence was prejudicial

20    As previously noted, the evidence supporting the rape and forcible oral copulation

21  convictions was ewxtremely weak. The introduction of the video undoubtedly created a

22  highly charged atmosphere in which the jury became prejudiced against petitioner –

23  especially because he was never "punished" for the acts depicted in the video.

24    The error in admitting the video tape of the incident with the Thai prostitute was

25  prejudicial under any standard. Consent the only disputed issue in the present case. The

26  alleged victims plainly consented to the sex acts, and were only later angered by

27  uncharged acts that occurred, and petitioner's alleged failure to pay for the services.

28    The introduction of the video undoubtedly created a highly charged atmosphere

24

1 which prejudiced the jury against petitioner – especially since he had never been

2 "punished" for the acts depicted in the video.

3       Without the introduction of this poisonous evidence, it is highly likely petitioner

4 would have obtained a more favorable outcome on the charges of rape and forced oral

5 copulation against the prostitutes who agreed to have sex and orally copulate him, and in

6 their testimony never once indicated they told or in anyway communicated to petitioner

7 that they were withdrawing their consent.  The error compels this court to render habeas

8 corpus relief.

9                                 **Conclusion**

10      Petitioner was convicted of multiple counts of rape and forcible oral copulation

11 based upon his bringing prostitutes to his apartment.  Having initially agreed to various

12 sex acts, each later claimed at some point she no longer wanted continue, yet neither one

13 expressed that to petitioner.  Nonetheless the jury convicted petitioner of these counts

14 after rejecting the testimony as to the kidnapping charge and allegations.  The evidence is

15 woefully insufficient on the issue of consent.  And this was exacerbated by the court

16 refusing to issue an instruction regarding a defendant's mistaken but good faith belief that

17 the other person had consented to the sex acts.

18      Lastly, the court admitted an irrelevant, shockingly inflammatory video which

19 little, if any, probative value.  This video undoubtedly prejudiced the jury against

20 petitioner to the point of denying him a fair trial.

21      Federal habeas corpus relief is warranted.

22 Dated:  _2/16_____, 2008.          Respectfully submitted,

23

24                                         PATRICK MORGAN FORD,
                                          Attorney for Petitioner
25                                        ANTONIO MICHAEL VITALE

26

27

28

                                          25