1
2
3
4
5
6
7
8          # UNITED STATES DISTRICT COURT
9          # SOUTHERN DISTRICT OF CALIFORNIA
10
11   ANTONIO MICHAEL VITALE,                    Civil No.    08cv0331-JLS (WMc)
12
                                Petitioner,      **REPORT AND RECOMMENDATION
13                                               OF UNITED STATES MAGISTRATE
              vs.                                JUDGE RE DENIAL OF PETITION
14                                               FOR WRIT OF HABEAS CORPUS**
15   MATTHEW CATE, Secretary of the
     California Department of Corrections and
16   Rehabilitation,
17                                Respondent.[1]
18          This Report and Recommendation is submitted to United States District Judge Janis L.

19   Sammartino pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States

20   District Court for the Southern District of California.

21                                    **I.**

22                         **FEDERAL PROCEEDINGS**

23          Antonio Michael Vitale (hereinafter "Petitioner") is a California prisoner proceeding by

24   and through counsel with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.

25   (Doc. No. 1.)  Petitioner challenges his San Diego County Superior Court conviction on three

26   counts of forcible rape and four counts of forcible oral copulation, claiming that his state and

27   ─────────────

28          [1]  The Court sua sponte substitutes Matthew Cate, the Secretary of the California Department
     of Corrections and Rehabilitation, as Respondent in place of his predecessor, James E. Tilton.

1    federal Constitutional rights were violated because: (1) insufficient evidence exists to support

2    the convictions; (2) the trial court erred in refusing to instruct the jury on the defense of good

3    faith belief in consent; and (3) the trial court erred in admitting into evidence a videotape of

4    Petitioner engaging in a sex act in Thailand.  (Pet. at 5-8.)

5           Respondent has filed an Answer to the Petition with an attached Memorandum of Points

6    and Authorities in Support thereof, and has lodged portions of the state court record.  (Doc. No.

7    3.)  Respondent contends that habeas relief is unavailable because: (1) the adjudication of claims

8    one and two by the state courts was neither contrary to, nor involved an unreasonable application

9    of, clearly established federal law; (2) even assuming an instructional error occurred with respect

10   to claim two, any error was harmless; and (3) claim three does not present a federal question, but

11   assuming it does, the state court's adjudication of the claim was objectively reasonable and any

12   error was harmless.  (Memorandum of Points and Authorities in Support of Answer ["Ans.

13   Mem."] at 9-21.)  Petitioner has filed a Traverse.  (Doc. No. 4.)

14          For the following reasons, the Court finds that Petitioner is not entitled to habeas relief,

15   and recommends the Petition be denied.

16                                          **II.**

17                              **STATE PROCEEDINGS**

18          In an nine-count Amended Information filed in the San Diego County Superior Court on

19   March 16, 2005, Petitioner was charged three counts of forcible rape in violation of Cal. Penal

20   Code section 261(a)(2), four counts of forcible oral copulation in violation of Cal. Penal Code

21   section 288a(c)(2), one count of kidnapping for rape in violation of Cal. Penal Code section

22   209(b)(1), and one count of possession of a controlled substance in violation of Cal. Penal Code

23   section 11377(a).  (Lodgment No. 1, Clerk's Tr. ["CT"] at 51-55.)  The Amended Information

24   alleged as sentencing enhancements that Petitioner had kidnapped the victims during the

25   commission of two of the rape counts and two of the oral copulation counts, and had committed

26   the rape and oral copulation offenses against more than one victim.  (CT 52-54.)

27          Prior to trial, Petitioner pled guilty to the possession of a controlled substance charge.

28   (CT 307.)  On March 25, 2005, a jury found Petitioner guilty of three counts of forcible rape and

four counts of forcible oral copulation.  (CT 319-30.)  The jury found Petitioner not guilty of kidnapping for rape, returned a not true finding regarding the allegations that he had kidnapped the victims during the commission of the offenses, and found true the allegation that the offenses were committed against multiple victims.  (Id.)  Petitioner was sentenced to a state prison term of thirty years-to-life plus twelve years.  (CT 331.)

Petitioner appealed his convictions, raising the same claims presented in his federal Petition here.  (Lodgment Nos. 3-5.)  The appellate court, in an unpublished opinion, affirmed in all respects.  (Lodgment No. 9, People v. Vitale, No. D046393 (Cal.Ct.App. Aug. 16, 2006).) Petitioner filed a petition for review in the state supreme court presenting the same claims. (Lodgment No. 12.)  That petition was denied by an order which stated: "Petition for review DENIED."  (Lodgment No. 13, People v. Vitale, No. S146674 (Cal. Nov. 29, 2006).)

## III.

## UNDERLYING FACTS

Victoria S.[2] testified that she began working as a prostitute at the age of eleven, that in May of 2003 she was sixteen years old, and that when she worked the streets she would usually work on El Cajon Boulevard in San Diego or Main Street in El Cajon.  (Reporter's Transcript ["RT"] at 31-33.)  Sometime between May and July of 2003, Victoria was walking along El Cajon Boulevard when a man, whom she identified in court as Petitioner, pulled up to her in a silver-colored, older model Honda Civic or Accord, and asked if she wanted a ride, to which she responded "no."  (RT 35-36, 39-40.)  She was near a gas station at the time and Petitioner pulled into the station and asked her again if she wanted a ride; her instincts told her not to go with him but she got in his car anyway.  (RT 37.)  They drove for a couple of minutes while Victoria "screened" Petitioner to see if he was connected to law enforcement.  (Id.)  He said he was not and she asked him to prove it, so he exposed his penis and she touched it.  (Id.)

When Petitioner asked Victoria her age, she said she was twenty, even though she was actually sixteen, and Petitioner told her he would pay her more if she was younger.  (RT 38.)

---

[2] The Court will adopt the format used by the state courts and will not use the full names of the juvenile victims.

She told him she was sixteen and asked him what he wanted to do; she could not remember whether he said just oral sex or oral sex and intercourse, but she quoted a price and Petitioner agreed. (Id.) Petitioner then said he wanted to do something a little "different," that he wanted to pull her hair lightly and wanted to spank her with a paddle. (Id.) He demonstrated by lightly pulling her hair and lightly smacking her leg. (Id.) At this point, Petitioner had pulled up to a traffic light just before entering the 805 freeway, and Victoria told him: "No, I don't want to go. Never mind. I don't want to do this." (Id.) Petitioner told her: "No, you're coming with me," and as Victoria was starting to get out of the car, the light turned green and Petitioner entered the freeway. (RT 38, 43.)

As they were driving down the freeway, Petitioner asked Victoria if she had ever been raped or molested, and she told him that she had and that it had stopped around the age of twelve or thirteen. (RT 40.) Petitioner said he was taking her to his place in Clairemont and that it was not very far, but that he had to stop at the bank on the way. (RT 41, 44.) They stopped at a bank, which was closed, and Petitioner walked up to the ATM machine while Victoria waited in the car. (RT 45-46.) Victoria said that at this point she was scared of Petitioner but did not know whether she should get out of the car. (RT 45.) She weighed about 111 pounds at the time and Petitioner was muscular, and she thought Petitioner could catch her and overpower her if she tried to run and she did not want to take that risk. (RT 46, 76-77.) When they arrived at Petitioner's apartment he parked the car in a garage. (RT 47.) Petitioner held Victoria's arm and had his hand on her back as he guided her toward the door to his apartment. (RT 78.) As they were entering the apartment through a door in the garage, Petitioner said to her: "You mean to tell me that some lucky man got to have that ass at 12 years old?", told her that he had paid a friend to let him have sex with his ten-year-old daughter, told her to pretend that she was twelve years old and to call him "pedophile," and said he was proud to be a pedophile. (RT 40-41, 48, 50-51.) Petitioner then grabbed Victoria by the back of the neck and threw her into the apartment. (RT 48.)

Victoria said that Petitioner sat on the couch, that she took her clothes off, that he asked her to perform oral sex on him, and that when she asked Petitioner to put on a condom he

refused.  (RT 48.)  She told Petitioner that if he began hurting her she would let him know, and

Petitioner told her to be sure and say: "Yes, pedophile" or "No, pedophile" when communicating

with him because he was likely to hurt her very badly.  (Id.)  At that point she was very scared

and thought Petitioner was going to kill her.  (RT 60.)  She began performing oral sex but tasted

urine.  (RT 48.)  She asked him if he was urinating, and Petitioner asked her if she could handle

that, to which she said no.  (RT 48, 53-54.)  She became scared by the way Petitioner looked at

her so she said she could handle it.  (RT 48.)  Petitioner then threw her on the floor and began

having intercourse with her.  (RT 49.)  He removed his penis from her vagina and began to

urinate on her, choking her with his hand on her throat while doing so, and told her he wanted

to urinate in her mouth.  (RT 49, 53.)  She said she could not handle it, and that as she tried to

breath she swallowed urine.  (RT 49.)  Petitioner then grabbed the hair at the back of her head

and rammed her head toward him forcing his penis in her mouth, which caused her to throw up.

(RT 49, 54-55.)  As she was throwing up, Petitioner said: "Good girl.  That's a good girl.  I'll

pay you more," and: "You know how to get me off."  (RT 49, 55.)

Petitioner dragged Victoria by the hair into another room and placed her face down on

a bed.  (Id.)  He pulled out a paddle and struck her on the buttocks twice.  (Id.)  Petitioner began

putting Vaseline on the paddle, telling Victoria that it would hurt less, and hit her two more

times, which hurt.  (RT 49-50, 56.)  Between the two paddling incidents, Victoria yelled, jumped

up, ran around and said: "Ow, no," to which Petitioner replied: "What did I tell you?  I told you

it's 'yes, pedophile or no, pedophile.'"  (RT 57.)  He then took her into the shower; she was

curled in a ball hugging her legs in the bottom of the bathtub as Petitioner began yelling at her,

saying: "Look at you, you're nothing but a 12-year-old little whore," and: "You're a sorry bitch,

and you're sitting there with piss all over you."  (RT 50.)  Petitioner's face had gotten very red,

and she asked him: "You really want to hurt me right now, don't you?", to which he replied:

"Oh, bitch, you don't know."  (Id.)

They went back to the living room where they engaged in intercourse "a couple more

times" in different positions, after which Victoria asked if she could clean herself.  (Id.)

Petitioner took her to the shower and she washed up.  (RT 50-51.)  She testified that Petitioner

became rougher and rougher with her during their encounter, that she had not wanted to perform

any of the sex acts that evening, that she had been unwilling to perform the acts even if she had

been paid more than the agreed upon price, and said that she complied with Petitioner's demands

because in her experience it was safer than trying to resist.  (RT 52-53, 58.)

Victoria asked for her money as they left the apartment but Petitioner said he had already

paid her, which she said was untrue.  (RT 61.)  When they got in the car Petitioner showed her

his cell phone, told her he had taken a picture of her with it, and said he was a cop and that they

were targeting underage prostitutes.  (RT 62-63.)  She exited the car and walked out a door

which opened to the outside front of the apartment, and then walked through a gate and across

the street.  (RT 63-64.)  Petitioner caught up to her, grabbed her by the arm and forced her to sit

on a flight of stairs; he asked her how old she really was and what her real name was.  (RT 64.)

Victoria said she was afraid of Petitioner so she broke free and ran across the street to a liquor

store and caught a ride from someone who took her to an AM/PM gas station off Clairemont

Mesa Boulevard.  (RT 64-65.)  At the gas station she became hysterical and threw up again;

someone there allowed her to use their telephone and she called her friend Chris Larkins.  (RT

67.)  When Larkins picked her up she told him she had been raped, and he yelled at her for being

"in the streets again."  (RT 68.)  She did not give Larkins all the details because although he is

her best friend she was embarrassed.  (RT 68-69.)  She did not call the police because she was

a runaway and a prostitute and thought the police would laugh at her and tell her she had put

herself in that predicament in the first place, something she had been told would happen by

experienced prostitutes, including her sister.  (RT 69-70.)  The next day, Victoria told her sister

about what had happened.  (RT 70.)

Victoria saw Petitioner again a few weeks later as she was crossing the street in El Cajon.

(RT 70.)  Petitioner asked her if she wanted a ride but did not seem to recognize her.  (Id.)  She

told him: "No. You're fucking sick."  (Id.)  She noted what type of car he was driving at that

time because Larkins had asked her what type of car he had been driving and was still trying to

get her to file a police report.  (RT 70-71.)  Petitioner made a u-turn and asked her again if she

wanted a ride, but when she tried to enter his license plate number in her cell phone, he sped

1    away.  (RT 71.)  She said he was driving the same car on that occasion as he was on the night

2    he raped her.  (RT 71.)  Victoria was not able to identify Petitioner's car from a photographic

3    lineup but did identify his tattoos from photographs.  (RT 72-74.)

4        Victoria testified that at the time of trial she was on juvenile probation for using her

5    sister's identity to obtain medical services.  (RT 83.)  She said that in November of 2003, as she

6    was providing information to a detective named Vile about prostitution activities at private

7    parties, she decided to tell the detective about her encounter with Petitioner, which was the first

8    time she had reported it to the police.  (RT 84-85.)  Petitioner had mentioned that he had a four-

9    year-old daughter, and Victoria had been molested starting about that age, so she decided to

10   report Petitioner because she believed he might in fact be a pedophile rather than just acting out

11   a fantasy and she wanted to prevent it from happening to another child.  (RT 85-86.)  She had

12   been in difficult situations with customers before who did not pay but had never reported it

13   before, but said that her encounter with Petitioner stood out because she felt so degraded, and,

14   unlike other encounters where she forgot about them right away, she was unable to forget the

15   "horrid" details of her encounter with Petitioner.  (RT 86.)  When shown a photograph of the

16   other victim in this case, Margaret W., Victoria said she might have seen her on the streets in

17   Anaheim in May 2004, but was not sure, and said that she did not discuss her encounter with

18   Petitioner with that woman or any other prostitutes, other than her sister.  (RT 78-79.)

19       Christopher Alan Larkins testified that he is friends with Victoria S. and had known her

20   for three or four years.  (RT 116.)  Sometime between May and June 2003, Larkins received a

21   call from Victoria at night asking to pick her up at a gas station in the Clairemont Mesa area.

22   (RT 116-17, 121.)  She appeared scared, was crying and wanted to leave the area.  (RT 117.)

23   She told Larkins that she had been raped, but was hesitant to provide any details.  (RT 117-18.)

24   She eventually told Larkins about the entire series of events, showed him large red paddle marks

25   she had on her inner thigh and buttocks, and told him that a man had asked if he could paddle

26   her gently but began to hit her hard and would not stop.  (RT 119-20.)

27       Margaret W. testified that she was nineteen years old and currently working as a waitress

28   in Florida.  (RT 134.)  When she was sixteen years old and living in Florida, she met a pimp who

got her started working as a prostitute. (RT 135-36.) She worked as a prostitute for about six months in Florida until a pimp named A.J. brought her to San Diego in May of 2003, at which time she was seventeen years old. (Id.) On May 23, 2003, at about 5:00 p.m., Margaret had been in San Diego for about a week and was working as a prostitute on El Cajon Boulevard when a man, whom she identified in court as Petitioner, pulled up in a Honda Civic. (RT 136-37.) A different man was waiting in his car to proposition her, but she went with Petitioner because he offered her $300 to spank him with a paddle. (RT 136-38.) As Petitioner entered a highway Margaret began getting an uneasy feeling because Petitioner did not say anything, which in her experience was unusual; they drove to a back alley where they parked, and then walked to a garage through which they entered a condominium. (RT 139.) As they entered the condominium, Petitioner said: "All right. I'm vice, and I can either take you to jail or you do what I say." (RT 141.) Margaret said that Petitioner had completely changed, that he was angry and his eyes had a blank, dead look which she thought was evil. (Id.) She was not sure if Petitioner had any weapons in the condominium so she did not try to run, but just began crying. (RT 142.) She was not sure if he was telling the truth, but she was underage and a runaway and did not want to be arrested. (Id.)

Margaret told Petitioner that she was twenty years old, but Petitioner told her to say that she was fifteen at every chance she had, which disgusted her. (RT 143-44.) Petitioner stood in front of her as she sat on the couch, pulled down his pants and demanded fellatio, which she performed for several minutes while crying, and after she had removed her shirt and pulled down her bra as demanded by Petitioner. (RT 144, 146.) Petitioner ordered her to get on the floor, pull down her underwear and lift up her skirt, which she did, and Petitioner performed oral sex on her for about a minute. (RT 144-45, 147.) Petitioner then had intercourse with her, after which he ejaculated on her chest. (RT 144-45, 147-48.) Margaret did not remember if she told Petitioner she did not want this to happen, saying she might have at some point but that she was frightened the entire time, thinking that Petitioner was capable of killing her if she refused. (RT 148.) She said Petitioner did not hurt her but acted as if he was having sex was his girlfriend, as if this type of thing was normal to him, even though she was crying the entire time. (Id.)

Petitioner went to the kitchen and threw a roll of paper towels at Margaret which she used to wipe herself off, and Petitioner told her: "Come on, I'll take you back through the garage." (RT 148, 150.) She grabbed her shirt and ran out the door. (RT 148.) She approached a Volkswagen van parked outside, and, crying hysterically, asked them for help. (RT 150.) Petitioner came outside and said something to the driver of the van, which Margaret could not remember, and walked down the alley to his car. (RT 150-51.) Petitioner never paid her and she did not ask for money because she just wanted to leave. (RT 151.) A woman in the Volkswagen van apparently called the police while Margaret called her pimp A.J. on her cell phone, who was angry that the police had been called; she then walked across the street and waited for the police to arrive. (RT 151-52.)

When the police arrived, Margaret directed them to the condominium, told them she still had semen on her neck, gave them the false name of Reyna Chanyet, and eventually agreed to a sexual assault examination. (RT 152.) She gave a false name because she was underage and did not want her family to find out that she was in San Diego working as a prostitute. (RT 152-53.) That was also the reason she falsely told the police that she had been forcibly abducted from the Hotel Circle area. (RT 153.) The police impounded the clothing she had been wearing that night. (RT 157.) Margaret said that she did not know Victoria S., was not aware any other woman had accused Petitioner of rape, and had never been in Anaheim. (RT 161-62.)

Charles Dunnigan, a San Diego Police Officer, testified that on May 23, 2003, he responded to 5170 Clairemont Mesa Boulevard to investigate a report of a rape. (RT 122-23.) He spoke briefly with the victim, who identified herself as Reyna Chanyet, and who was crying and upset. (RT 123.) The woman directed Officer Dunnigan to unit number two of the condominium complex, and when no one answered the door the officers on the scene entered. (RT 124-25.) Once the officers had determined no one was in the unit, they secured the condominium, obtained a search warrant and photographed the interior of the unit. (RT 125.) Officer Dunnigan collected some paper towels which the victim had said were used by the perpetrator to wipe semen off himself or her. (RT 125-26.)

/ / /

1    David Lee Harris, Jr., testified that on May 23, 2003, he and his wife and four children

2    were driving their Volkswagen van to dinner, and had stopped at a corner when a young girl ran

3    out of an apartment building screaming and yelling. (RT 193.) She was hysterical, jumping,

4    crying and screaming, and they called the police. (RT 193-94.)

5    Carolyn Quinn testified that she is married to David Harris, that they were in their

6    Volkswagen van on May 23, 2003, and had just pulled up to the intersection of Clairemont Mesa

7    Boulevard and Limerick when a woman banged on the window screaming that she had been

8    raped and asked for help. (RT 198-200.) Quinn got out of the van and helped the woman, who

9    was hysterical, and who pointed at a man crossing Limerick, whom Quinn identified in court as

10   Petitioner, saying: "He raped me" several times. (RT 200-03, 209.) Petitioner said: "Yeah, I

11   raped her" in a sarcastic tone as he walked away and proceeded into a back alley. (RT 204, 209-

12   11.) Quinn wanted to call the police but the woman absolutely refused; she told Quinn that

13   Petitioner had said he was a police officer and that if she did not do what he said she would be

14   in a lot of trouble. (RT 205.) The woman then used her own cell phone to call a man, and when

15   Quinn took the phone and told the man they needed to call the police, the man told her: "Shut

16   up, you fucking bitch. Get off the phone. Leave her alone." (RT 206.) The woman also told

17   Quinn to leave her alone and walked away across the street. (RT 207.) Quinn called the police

18   from a pay phone across the street and waited for the police to arrive. (RT 208.)

19   John J. Zimmerman, an Investigator with the San Diego County District Attorney's

20   Office, testified that he located Margaret W. in Florida, that he spoke to her on the telephone on

21   October 26, 2004, at which time she confirmed that she had been the victim of a crime in San

22   Diego and had used the name Reyna Chanyet. (RT 217-19.) Margaret said she was not

23   available for a long conversation and agreed to call Zimmerman back. (RT 220.) A couple of

24   days later, Margaret called Zimmerman and he recorded the interview and took her statement,

25   which was consistent with her trial testimony. (RT 220-21, 224-33.) Zimmerman and his

26   partner traveled to Fort Lauderdale, Florida, on December 19, 2004, met with Margaret, and

27   arranged for her to travel to San Diego to testify. (RT 222.)

28   ///

Carlton Ray Hershman, Jr., a Detective with the sex crimes unit of the San Diego Police Department, testified that he secured and executed a search warrant on Petitioner's condominium located at 5170 Clairemont Mesa Boulevard, unit two, at 8:35 p.m. on May 23, 2003, in connection to the sexual assault of Margaret W. (RT 236-38.)  When they entered the unit they found the television on, the front door open, a roll of paper towels and a used piece of paper towel on the couch, and a magazine and paddle under the couch. (RT 239.)  Detective Hershman returned to the unit a week later, but Petitioner was not there and did not appear to have returned in the interim. (RT 241.)  Detective Hershman eventually spoke to Petitioner after obtaining Petitioner's cell phone number from his workplace, and informed Petitioner that he was conducting an investigation and had searched his condominium. (RT 242.)  On June 26, 2003, Detective Hershman secured a warrant to obtain a sample of Petitioner's DNA, which he collected from Petitioner at his workplace, Pacific Honda. (RT 242-43.)  Detective Hershman said it is not unusual for a runaway or a prostitute to give a false name when reporting a sex crime, and ordered DNA testing of the paper towel collected from Petitioner's condominium just in case the victim later came forward, and in case other victims were involved. (RT 244-45.)

Michelle Lynn Murphy testified that she had known Petitioner for about two years, and that they are friends and were co-workers at Cush Honda and Tipton Honda. (RT 266-67.)  Murphy received a telephone call from Petitioner on the evening of May 24, 2003, during which Petitioner said he needed a place to stay for a couple of days and that he had tried to call her the previous night. (RT 267.)  Murphy had spent the night of the 23rd at a girlfriend's house, and Petitioner told her that he had stayed at a motel that night. (RT 268.)  Murphy said that Petitioner had never spent the night at her apartment before, and that she allowed him to stay there for three days where he slept on a couch. (RT 268-69.)  Petitioner told her he did not want to drive his own car while he was staying with her, and said that he could not go to work, but he did not offer any explanation as to why he could not return to his condominium or go to work and Murphy did not ask. (RT 269-70.)

San Diego Police Detective Daniel Vile testified that most prostitutes have an innate mistrust for the police and are reluctant to contact the police to report any problem. (RT 272-

73.) Detective Vile said he was interviewing Victoria S. at juvenile hall in connection to a pimping investigation in a case unrelated to Petitioner's prosecution, when, after the interview was over, Victoria mentioned that she had been sexually assaulted while working on the streets and said she could take the Detective to where the assault occurred. (RT 273-74.) About a month and a half later, on January 7, 2004, Detective Vile and his partner checked Victoria out of juvenile hall and she led them to 5170 Clairemont Mesa Boulevard, unit two. (RT 275.) They bought Victoria lunch while Detective Vile took her statement, after which they returned her to juvenile hall. (RT 277-78.) Detective Vile began an investigation and learned from tax assessor's records that the condominium belonged to Petitioner. (RT 278.) He also learned that a gray Honda was registered to Petitioner, that he worked at a Honda dealership, and that a police report accusing Petitioner of a sexual assault of Margaret W. had been filed about six months earlier. (RT 279-80.)

On February 10, 2004, Detective Vile executed a search warrant on Petitioner's condominium where he seized Petitioner's passport, which showed a trip to Thailand from December 2003 to January 2004, and seized a paddle, clothing which appeared to be a police uniform, a videotape that was labeled "Thai," and commercial pornography which included video and audio tapes depicting acts of urinating in people's mouths. (RT 285-89.) Victoria S. picked Petitioner's photograph from a photographic lineup Detective Vile showed her the next day. (RT 291-94.) He contacted Carolyn Quinn about a week later and showed her the same lineup, and she picked Petitioner's photograph as the man she saw on the night Margaret W. was raped. (RT 294-96.) The "Thai" videotape seized from Petitioner's condominium was played for the jury (RT 299) and a copy of the transcript of the videotape is in the record (CT 250-55). The appellate court used Petitioner's description of the videotape, adding its own comments in parenthesis:

> The tape begins with appellant and the young woman, conceded to be a prostitute, on a bed in what appears to be a hotel room. Both are naked. From the surroundings and other scenes on the tape not presented to the jury the incident appears to take place in Thailand. [¶] Appellant is first shown shaving the pubic area of the woman. He stops for a moment and slaps the woman on the side of her face. [Footnote: The trial judge characterized the slap as hard and says the woman was very fearful.] (The woman begins to cry.) He tells her "look, look." She

starts crying and he tells her, "Good girl." She is seen holding the side of her face and asking appellant not to hit her. He assures her, and tells her "Good girl." [¶] Appellant sits on the edge of the bed and has the woman kneel down on the floor in front of him. He tells her to "suck" and she orally copulates him. After a few minutes, he is seen holding the back of her head, forcing his penis all the way into her mouth. She begins to gag. Appellant is heard to say "Yes," approximately 10 times. Appellant places the woman on the bed, out of the view of the camera. He tells her, "Open your mouth," and choking sounds are heard. Appellant again encourages the woman. A few minutes later, the woman is seen getting off the bed and appellant eventually does the same.

(Lodgment No. 9, <u>People v. Vitale</u>, No. D046393, slip op. at 19-20.)

The jury was given an admonition by the trial judge regarding their consideration of the videotape. (RT 297-98.) Detective Vile said that the videotape was made approximately eight to nine months after the sexual assaults of Margaret W. and Victoria S., and that it showed conduct similar to Victoria's assault in that it showed the victim gagging and throwing up while Petitioner encouraged her to throw up and called her a "good girl." (RT 325-26.)

Detective Vile received a telephone call from Petitioner on March 3, 2004, which was recorded. (RT 326-27.) The recorded conversation, which lasted a little over an hour, was played for the jury (RT 330), and a copy of the transcript of the recording is in the record (CT 166-249). The jury was given an admonition by the trial judge regarding their use of this evidence. (RT 329.) The appellate court described the conversation as follows:

When the officer asked appellant about Margaret running from his apartment, he stated she was unhappy because she did not get as much money as she wanted and because appellant was not willing to drive her back to El Cajon Boulevard. Appellant stated he wanted to have intercourse with Margaret without a condom. Margaret agreed but when the act was over she changed her mind and was angry she had sex without a condom. Appellant stated he gave Margaret no money. He stated: "She started being a bitch and yelling." He offered her money and told her to get out. She left the apartment, saying she had been raped. Appellant stated Margaret tore her own clothes and that he did not grab her in a hard manner. [¶] At first it did not appear that appellant, who had been with many prostitutes, specifically remembered Victoria. Later in the interview, he seemed to recollect who the officer was referring to. He said there was no rape and he had not urinated in her mouth. In any case, appellant told the officer he had never asked a woman to call him pedophile. Later in the interview, appellant stated he had urinated in prostitutes' mouths. Appellant stated he had never paddled a prostitute. [¶] In explaining why Victoria and Margaret would claim he raped them, appellant stated that prostitutes are crazy, the two women probably knew each other and decided, perhaps because of the bad end to his encounter with Margaret, to get him in trouble. Appellant also stated that on a number of occasions he told prostitutes he was a "reporter" for the police, that he had connections with the police and knew vice officers. Appellant stated he would tell

the women that if they would "do this for me or that for me" he would make sure the police would leave them alone. Appellant speculated that when the women found out he had no such connections, they were angry because he had "conned" them. [¶] Appellant also discussed the circumstances surrounding the videotape made in Thailand. Appellant stated the Thai woman was probably 25 to 29 years of age. She was a prostitute he paid to engage in sex acts. Appellant admitted slapping her and that being struck frightened the woman. Appellant noted he had not beaten the girl to death. When the officer stated the girl looked "pretty scared," appellant replied: "Well, yeah. And that was the whole idea."

(Lodgment No. 9, <u>People v. Vitale</u>, No. D046393, slip op. at 7-9.)

Marjorie Gigi Scott testified that she is a registered nurse who administered a sexual assault examination on May 23, 2003, at 8:30 p.m., to a woman who identified herself as Reyna Chanyet. (RT 302-07.) The woman refused a pelvic examination and a blood draw. (RT 308.) She told Scott that she had been walking down the street when a man driving a Honda Civic had identified himself as a bail bondsman and told her she looked like someone he had been searching for. (RT 309-10.) She told Scott that the man forced her into the car and drove to a condominium complex where he forced her to undress, orally copulated her, masturbated and ejaculated on her face, neck and chest, and when he threatened to have intercourse with her, she started to scream and fight. (RT 310.) The man then told her to dress and they left together. (<u>Id.</u>) Once outside she ran to the street to a passing car and told the driver she had been raped, and the passenger stayed with her while the driver called the police. (<u>Id.</u>)

Shawn Montpetit, a Criminalist with the Forensic Biology section of the San Diego Police Department Crime Laboratory, testified that he examined biological evidence obtained from a rape examination of Margaret W. (RT 354-55.) DNA testing indicated that Petitioner's DNA was found in samples taken from Margaret's chest and neck, and on the paper towel seized from his condominium. (RT 357-62.)

The parties stipulated that Joan Bliss, a registered nurse, would, if called, testify that on November 18, 2004, she took the photographs of Petitioner's upper body depicting his tattoos which were shown to Margaret W. and Victoria S. during their testimony, and to the jury. (RT 364.) The parties also stipulated that urine samples collected from Margaret W. during the rape examination revealed that a negligible amount of marijuana was present in her system, but that it was not enough to cause impairment. (RT 364-65.)

1       Kemp Thongrivong, a San Diego Police Officer, testified that he is familiar with the Thai

2   language, customs and culture, and that he reviewed the videotape seized from Petitioner's

3   condominium. (RT 368-69.) The videotape showed Petitioner slapping a prostitute in the face

4   while the woman said in Thai not to slap her. (RT 370.) The parties stipulated that Victoria S.

5   was currently on juvenile probation, and the prosecution rested. (RT 391.)

6       The defense called Frances William Fant, who testified the she resides at 5170 Clairemont

7   Mesa Boulevard, unit four, and was home in mid-2003 when the police responded to unit

8   number two. (RT 392.) Fant said that she and her son were in their garage unloading groceries

9   when Petitioner and a young woman, who was walking in front of Petitioner, entered through

10  her open garage door and proceeded into his garage, which is not separated from Fant's garage

11  by an interior wall, and then into his condominium. (RT 393-94.) The woman with Petitioner

12  did not appear to be in any kind of duress, something Fant was accustomed to seeing in her work

13  with pregnant drug addicts and as a rape counselor, and she would have called the police if she

14  had noticed that the woman was under any kind of duress. (RT 395-96.) Fant later asked

15  Petitioner why the police were there and Petitioner told her that: "He had been accused of rape

16  by the chick that he had walked in with." (RT 392-93.)

17      Walter Escobar, a San Diego Police Detective, testified that he was on duty on May 23,

18  2003, and that he interviewed Margaret W., who identified herself as Reyna Chanyet, at the

19  hospital following a rape examination. (RT 403-04.) Margaret told Detective Escobar that she

20  had been walking in the Hotel Circle area when a male in a car approached her, said something

21  about a bail bondsman, and told her she looked like someone he was looking for. (RT 405.)

22  Margaret said the man grabbed her and pulled her into the car. (RT 405-06.) She said she

23  kicked the dashboard of the car and thought about jumping out, but the man entered a freeway.

24  (RT 406.) She said they drove to an alleyway and entered an apartment through a garage, and

25  that the man threatened to hurt her if she made any noise. (RT 407.) She said that when they

26  were in the apartment, the man took off her shirt and underwear and orally copulated her for

27  about seven minutes while she pulled his hair and tried to scoot back with her elbows, and that

28  that was the only sex act which had taken place, although he had ejaculated on her chest. (RT

1   407-08.)  She said she escaped through the front door and ran into a woman in a Volkswagen

2   van who called the police.  (RT 408-09.)  Detective Escobar later spoke to Margaret on the

3   telephone but said she did not want to cooperate in the investigation.  (RT 411-12.)  The defense

4   rested and there was no rebuttal evidence.  (RT 415.)

5          The jury was instructed (RT 421-50), the attorneys presented argument (RT 450-528),

6   and the jury received their final instructions (RT 528-36).  After deliberating approximately one

7   full day, during which they requested a read-back of the cross-examination of Victoria S., the

8   jury found Petitioner guilty of two counts of forcible rape and two counts of forcible oral

9   copulation with respect to Victoria S., one count of forcible rape and two counts of forcible oral

10  copulation with respect to Margaret W., and found Petitioner not guilty of kidnapping.  (CT 316-

11  30.)  The jury found true the sentencing enhancement allegation that the crimes involved more

12  than one victim, but found not true the enhancement allegation that Petitioner kidnapped the

13  victims during the commission of the crimes.  (CT319-26.)  Petitioner was sentenced to two

14  consecutive terms of 15 years-to-life, plus 12 years in consecutive enhancements.  (CT 331.)

15                                              **IV.**

16                              **PETITIONER'S CLAIMS**

17          (1)   Petitioner's Fourteenth Amendment right to due process was violated because

18  insufficient evidence exists to support his convictions, in that there was no evidence that the

19  victims withdrew their consent to engage in the sex acts, or communicated to Petitioner their

20  withdrawal of consent or their objection to engaging in the sex acts, nor any evidence they acted

21  under duress.  (Pet. at 5-7; Memorandum of Points and Authorities is Support of Petition ["Pet.

22  Mem."] at 8-14.)

23          (2)   Petitioner's Sixth and Fourteenth Amendment rights to due process and a fair trial

24  were violated by the trial court's refusal to instruct the jury regarding a defense of good faith

25  belief that the victims consented to the sexual acts.  (Pet. at 7; Pet. Mem. at 14-19.)

26          (3)   Petitioner's Fourteenth Amendment right to due process and a fair trial were violated

27  by the introduction of the videotape of the sexual encounter in Thailand.  (Pet. at 7-8; Pet. Mem.

28  at 19-25.)

# V.

# **DISCUSSION**

For the following reasons, the Court finds that the adjudication of Petitioner's claims by the state courts was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Accordingly, the Court recommends the Petition be denied.

## A.    **Standard of Review**

Title 28, United States Code, § 2254(a), sets forth the following scope of review:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States</u>.

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

Under 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (West 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000). A state court decision may involve an "unreasonable application" of clearly established federal law, "if the

1  state court identifies the correct governing legal rule from this Court's cases but unreasonably

2  applies it to the facts of the particular state prisoner's case." Id. at 407.  An unreasonable

3  application may also be found, "if the state court either unreasonably extends a legal principle

4  from [Supreme Court] precedent to a new context where it should not apply or unreasonably

5  refuses to extend that principle to a new context where it should apply." Id.

6      "[A] federal habeas court may not issue the writ simply because the court concludes in

7  its independent judgment that the relevant state-court decision applied clearly established federal

8  law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable."

9  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

10  Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United

11  States Supreme] Court's decisions." Williams, 529 U.S. at 412.

12      Habeas relief is also available if the state court's adjudication of a claim "resulted in a

13  decision that was based on an unreasonable determination of the facts in light of the evidence

14  presented in state court."  28 U.S.C.A. § 2254(d)(2) (West 2006).  In order to satisfy this

15  provision, Petitioner must demonstrate that the factual findings upon which the state court's

16  adjudication of his claims rest, assuming they rest on a factual determination, are objectively

17  unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

18  **B.    Petitioner is not entitled to habeas relief with respect to claim one.**

19      Petitioner contends in claim one that his Fourteenth Amendment right to due process was

20  violated because insufficient evidence exists to support his rape and oral copulation convictions.

21  (Pet. at 5-7; Pet. Mem. at 8-14.)  Specifically, he claims that the sole issue at trial was whether

22  the victims consented to sexual intercourse and oral copulation, but there was no evidence

23  adduced at trial that Victoria S. acted under force or duress, and no evidence that she withdrew

24  her consent which had been given when she agreed to have paid sex with Petitioner, or that if

25  she did withdraw her consent that she communicated that fact to Petitioner. (Pet. Mem. at 8-10.)

26  Petitioner claims that Margaret W. also consented to have paid sex with him, and that the

27  evidence showed that she never withdrew her consent, particularly in light of the fact that she

28  testified that Petitioner treated her like his girlfriend, she never resisted or communicated a

1    desire to leave, she called her pimp immediately afterward rather than the police, and she

2    initially refused to cooperate in the police investigation.  (Id. at 11-12.)

3        Respondent argues that the state appellate court's adjudication of this claim, on the basis

4    that there was sufficient evidence that the participation in the sex acts by the victims did not

5    occur of their free will and was not consensual, was a reasonable application of federal law.

6    (Ans. Mem. at 9-11.)  Petitioner replies that Respondent's argument is cursory and incorrect.

7    (Traverse at 2-6.)

8        Petitioner presented claim one to the state supreme court in a petition for review.

9    (Lodgment No. 12.)  That petition was denied by an order which stated: "Petition for review

10   DENIED."  (Lodgment No. 13, People v. Vitale, No. S146674 (Cal. Nov. 29, 2006).)  He

11   presented the same claim on direct appeal.  (Lodgment Nos. 3-5.)  The appellate court, in an

12   unpublished opinion, affirmed the judgment of conviction.  (Lodgment No. 9, People v. Vitale,

13   No. D046393 (Cal.Ct.App. Aug. 16, 2006).)

14        In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Court adopted a presumption which

15   gives no effect to unexplained state court orders but "looks through" them to the last reasoned

16   state court decision.  The Court will look through the silent denial by the state supreme court to

17   the last reasoned state court opinion.  After articulating the standard of review used in addressing

18   the claim, the appellate court stated:

19
20            There is no doubt that at the beginning of their encounter Victoria freely entered into an agreement with appellant for sex in exchange for money. Victoria
21   testified, however, that appellant's requests for unusual sex acts and his general demeanor frightened her.  She told appellant she did not want to go with him and attempted to get out of his car.  Appellant told her to stay in the car and that she was coming with him.  When the two arrived at the door to appellant's apartment,
22   he made additional unusual requests and threatened to hurt her if she did not comply.  Appellant grabbed her by the neck and threw her into his apartment.
23   Victoria testified she was afraid of appellant and did not want to engage in any of the sex acts that occurred.
24

25            There was sufficient evidence that Victoria's participation in sex acts with appellant was nonconsensual and did not occur as a result of her free will.  She
26   testified she did not want to engage in the acts.  Sufficient evidence supports the truth of that claim.  Her initial agreement with appellant notwithstanding the evidence suggests the nature of their relationship quickly turned from contractual
27   to criminal.  The basis for their relationship ceased to be their agreement and became appellant's assertion of authority.  Appellant wanted Victoria to behave
28   in particular ways and he did not rely on his promise of money to ensure that behavior.   Victoria stated she found appellant's demand for certain acts

1    frightening.  The evidence supports the conclusion Victoria did not want to be
2    around appellant and certainly did not want to engage in sexual relations with him.
     There was sufficient evidence that the sex acts in appellant's apartment were
3    nonconsensual.

4            Margaret W. and appellant entered into an agreement in which for a
     payment of $300 she would spank appellant with a paddle.  Her understanding of
5    the contract was that the $300 was for paddling and did not include other sex acts.
     At his apartment appellant appeared angry.  Appellant, not unlike the situation
6    with Victoria, soon changed the nature of the relationship from one dictated by
     their agreement to one dictated by his assertion of authority and control.
7    Appellant told Margaret he was a vice officer and that if she did not do what she
     was told he would take her to jail.  Margaret was not sure if appellant was in fact
8    a police officer but did know she was afraid of him and that she did not want to
     go to jail.

9            Margaret did not want to engage in sex acts with appellant.  In her mind she
     had never agreed to such acts.  The evidence supports the conclusion that her
10   submission to appellant was not an act of free will and, thus, was not consensual.

11   (Lodgment No. 9, <u>People v. Vitale</u>, No. D046393, slip op. at 12-14.)

12           The clearly established federal law regarding sufficiency of the evidence claims in the

13   criminal context is set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  In <u>Jackson</u>, the

14   Court held that the Fourteenth Amendment's Due Process Clause is violated, and an applicant

15   is entitled to habeas corpus relief, "if it is found that upon the record evidence adduced at the

16   trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

17   <u>Jackson</u>, 443 U.S. at 324.  In making this determination, habeas courts must respect the province

18   of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw

19   reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner

20   that supports the verdict.  <u>Id.</u> at 319.  Once a state court fact finder has found a defendant guilty,

21   federal habeas courts must consider the evidence "in the light most favorable to the prosecution."

22   <u>Id.</u>  Federal habeas courts must also analyze <u>Jackson</u> claims "with explicit reference to the

23   substantive elements of the criminal offense as defined by <u>state</u> law."  <u>Id.</u> at 324 n.16 (emphasis

24   added).

25           The Ninth Circuit has stated that: "After AEDPA, we apply the standards of *Jackson* with

26   an additional layer of deference."  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1275 (9th Cir. 2005).  In

27   <u>Allen</u>, the Ninth Circuit first reviewed the standard of review applied by the state appellate court

28   to a sufficiency of the evidence claim, and found that although the state court did not cite to the

relevant federal case law, "such a citation is not required 'so long as neither the reasoning nor the result of the state-court decision contradicts' Supreme Court precedent." See id. at 1274 n.12, quoting Early v. Packer, 537 U.S. 3, 8 (2002). The state appellate court here applied a standard similar to Jackson and similar to that applied by the state court in Allen (compare id. and Lodgment No. 9, People v. Vitale, No. D046393, slip op. at 9-10), and this Court must similarly determine whether the state appellate court opinion here "reflected an unreasonable application of *Jackson . . .* to the facts of this case." Allen, 408 F.3d at 1275.

Viewing the evidence "in the light most favorable to the prosecution," as this Court must, it is clear that sufficient evidence was adduced at trial to support the convictions. Petitioner contends the evidence does not establish that the victims withdrew their consent to have sex with him, or communicated such a withdrawal to him. However, Victoria S. testified that when Petitioner was stopped at a traffic light waiting to enter the freeway shortly after picking her up, she told him: "No, I don't want to go. Never mind. I don't want to do this." (RT 38.) She testified that she started to get out of the car but Petitioner said: "No, you're coming with me" and entered the freeway. (RT 38, 43.) Although she had an opportunity to escape when Petitioner left her in the car as he walked up to the ATM, Victoria testified that at that point she was scared of Petitioner, that she thought Petitioner could catch her and overpower her if she tried to run, and that she did not want to "risk it." (RT 45, 76-77.) Victoria also testified that when they arrived at Petitioner's apartment he held her arm and had his hand on her back as he guided her toward the door to his apartment. (RT 47, 78.) She testified that as they were entering the apartment he grabbed her by the back of the neck and threw her into the apartment. (RT 48.) Thus, Victoria's testimony was sufficient to establish that prior to any sex acts being performed she had withdrawn whatever consent she had given to have paid sex with Petitioner, that she had communicated that withdrawal to Petitioner, and that Petitioner acted in a manner demonstrating that he understood that she had withdrawn the previous consent.

In addition, once Petitioner began to engage in sex acts with Victoria, the jury was able to draw a reasonable inference that the sex was not consensual and was performed under duress. Victoria testified that Petitioner told her he was likely to hurt her very badly, and she said she

was very scared and thought Petitioner was going to kill her. (RT 48, 60.) She objected when she tasted urine while performing oral sex and became scared by the way Petitioner looked at her when she said she could not handle it. (RT 48, 53-54.) Immediately after the subsequent intercourse, Petitioner urinated on Victoria while choking her with his hand on her throat, and then urinated in her mouth despite her protestations. (RT 49, 53.) She testified that Petitioner then grabbed the hair at the back of her head and rammed her head toward him forcing his penis in her mouth, causing her to throw up, and then dragged her by the hair into another room and placed her face down on a bed where he struck her on the buttocks with a paddle. (RT 49, 54-55.) During the paddling, Victoria said she yelled, jumped up, ran around and said: "Ow, no," to which Petitioner merely replied: "What did I tell you? I told you it's 'yes, pedophile or no, pedophile.'" (RT 57.) She testified that he then took her into the shower, and yelled at her while she was curled in a ball hugging her legs in the bottom of the bathtub. (RT 50.) Petitioner's face had gotten very red at this point, and she asked him: "You really want to hurt me right now, don't you?", to which he replied: "Oh, bitch, you don't know." (Id.)

Thus, the jury was presented with sufficient evidence from which they could draw a reasonable inference that, even assuming Victoria initially consented to have sex with Petitioner for money, she withdrew that consent, and communicated that withdrawal to Petitioner, prior to their arrival at Petitioner's condominium. Even to the extent that Petitioner contends Victoria's actions of not attempting to escape at the bank, and of walking through the garage without resisting or attempting to run away, demonstrates that she had not withdrawn her consent prior to entering the apartment, Petitioner's actions of grabbing her head, throwing her into the condominium and having forced sex while threatening to hurt her, provides sufficient evidence from which the jury could draw a reasonable inference that the sex was not consensual and that Petitioner was aware that Victoria did not consent to the sex acts he performed on her. The appellate court's adjudication of this aspect of claim one, on the basis that the evidence supported a finding that Victoria did not want to be there, did not want to engage in sexual relations with Petitioner, and that the sex acts were not consensual, did not involve "an unreasonable application of *Jackson* . . . to the facts of this case." Allen, 408 F.3d at 1275.

The same is true with respect to victim Margaret W. She testified that she went with Petitioner because he offered her $300 to spank him with a paddle. (RT 136-38.) However, as they entered the condominium, Petitioner said: "All right. I'm vice, and I can either take you to jail or you do what I say." (RT 141.) Margaret said that Petitioner had completely changed at that point, and that he was angry and his eyes had a blank, dead look which she thought was evil. (Id.) She testified that she did not try to escape because she was not sure if Petitioner was really a police officer or if he had any weapons in the condominium, and because she was underage and a runaway and did not want to be arrested. (RT 142.) Margaret testified that she began crying, and that Petitioner stood in front of her as she sat on the couch, pulled down his pants and demanded fellatio, which she performed while crying. (RT 144, 146.) Petitioner ordered her to get on the floor, pull down her underwear and lift up her skirt, which she did, and Petitioner orally copulated her for about a minute while se cried. (RT 144-45, 147.) Petitioner then had intercourse with her, after which he ejaculated on her chest. (RT 144-45, 147-48.)

Thus, there was no evidence that Margaret consented to have sex with Petitioner, merely that she had agreed to accept money to paddle Petitioner. Even to the extent a reasonable inference could be drawn that consent to sexual activity was agreed upon because Margaret was a prostitute and entered Petitioner's condominium voluntarily, her testimony regarding what happened inside the condominium provided a basis for the jury to draw a reasonable inference that the ensuing sexual contact was not consensual. She testified that Petitioner told her he was a police officer and gave her the choice of going to jail or performing the sex acts, hardly a consensual encounter. In addition, as the appellate court pointed out, Margaret testified that she was crying during the sex acts.

Petitioner relies on Margaret's testimony that she could not remember if she told Petitioner she did not want the sex acts to happen and was unsure whether she communicated her objections to Petitioner, as well as her testimony that Petitioner did not hurt her but acted as if he was having sex was his girlfriend. However, that testimony, when viewed in context, demonstrates that Margaret was expressing her opinion that Petitioner acted as if it was "normal to him" to have sex with a crying woman. (RT 148.) As discussed below with respect to claim

two, the circumstances surrounding Petitioner's encounters with both victims were such that a reasonable person would not have a good faith belief that the victims consented to the sexual acts. The jury was presented with sufficient evidence from which to draw a reasonable inference that Margaret did not consent to the sex acts Petitioner performed on her. Viewing the evidence "in the light most favorable to the prosecution," as this Court must, it is clear that sufficient evidence exists to support the jury's finding that Margaret did not consent to sex with Petitioner, and that Petitioner was aware that she did not consent to the sex acts but submitted to them under duress. The appellate court's adjudication of this aspect of claim one, on the basis that "the evidence supports the conclusion that her submission to [Petitioner] was not an act of free will and, thus, was not consensual," did not involve "an unreasonable application of *Jackson* . . . to the facts of this case." Allen, 408 F.3d at 1275.

Accordingly, the Court finds that the state court's adjudication of claim one was neither contrary to nor involved an unreasonable application of clearly established federal law. The Court therefore recommends habeas relief be denied as to claim one.

**C.    Petitioner is not entitled to habeas relief with respect to claim two.**

Petitioner contends in claim two that his Sixth and Fourteenth Amendment rights to due process and a fair trial were violated by the trial court's refusal to instruct the jury regarding a defense of good faith belief that the victims consented to the sexual acts. (Pet. at 7; Pet. Mem. at 14-19.) He argues that the trial judge refused to give the instruction based on what Petitioner contends was an incorrect citation of the testimony of the victims by the trial judge when the judge stated that the victims had become fearful and had withdrawn their consent. (Id. at 14.) Petitioner admits that the victims testified at some point during their encounter with him that they became afraid of him or wanted to stop due to his behavior or demeanor, but contends that they never communicated their desire to stop to him, which he argues is a classic example of a situation where the requested instruction is appropriate. (Id. at 16-17.)

Respondent contends that the appellate court reasonably rejected this claim on the basis there was insubstantial evidence supporting the instruction. (Ans. Mem. at 11-12.) Respondent argues that there is no possibility that the acts of threatening Victoria S. and forcing her into his

condominium, and having sex with Margaret S. while she was crying, could lead to a reasonable, honest but mistaken belief that the sex was consensual. (Id. at 14-15.) Respondent also contends that even assuming it was error to refuse to give the instruction, such error was harmless in light of the overwhelming and virtually undisputed evidence that the victims submitted to the sex acts only because Petitioner threatened them and because they were afraid for their lives. (Id. at 15.) Petitioner replies that the fact that neither victim communicated to Petitioner that she no longer wanted to engage in the sex acts, coupled with Petitioner's recorded statement to Detective Vile stating that the acts were consensual, entitled Petitioner to the instruction. (Traverse at 8.)

Petitioner presented claim two to the state supreme court in a petition for review. (Lodgment No. 12.) That petition was denied in an order which stated: "Petition for review DENIED." (Lodgment No. 13, People v. Vitale, No. S146674 (Cal. Nov. 29, 2006).) He presented the same claim on direct appeal. (Lodgment Nos. 3-5.) The appellate court, in an unpublished opinion, affirmed the judgment of conviction. (Lodgment No. 9, People v. Vitale, No. D046393 (Cal.Ct.App. Aug. 16, 2006).)

The Court will look through the silent denial by the state supreme court to the last reasoned state court opinion. After articulating the standard of review used in addressing the claim, and noting that the trial court refused to give the requested instruction "because it believed there was no substantial evidence appellant 'honestly and reasonably, but mistakenly, believed the victim consented to sexual intercourse,'" the appellate court stated:

> While appellant did not testify at trial, the record in the form of his telephone conversation with Officer Vile reveals much about his state of mind. It was appellant's position that he had never raped a prostitute. He made that specific claim with regard to Margaret W. He stated their encounter and activities were consensual. It was only after the events, perhaps because of Margaret's unhappiness with her payment, her anger with appellant's failure to use a condom or appellant's refusal to return her to where he picked her up, that she claimed, falsely, she was raped.
>
> Margaret told a very different story. She stated that while she agreed to paddle appellant, the two never had an agreement for other sexual activity. At appellant's apartment, he appeared angry, told her he was a police officer and if she did not do what she was told he would take her to jail. Margaret testified she cried during the sexual activity. Margaret stated appellant refused her request to wear a condom.

If appellant's version of events was believed, Margaret unequivocally consented to sexual activity in exchange for money. If Margaret was believed, she was raped and forced to orally copulate appellant. There was no middle ground and the trial court properly refused to give a *Mayberry* instruction with regard to the charges relating to Margaret.

Appellant's recollection of his encounter with Victoria was less clear. It does appear he was able at least late in his conversation with Officer Vile to remember who Victoria was. In any event appellant stated he had never raped anyone, he had never asked anyone to call him pedophile and had never hit anyone with a paddle. The clear import of appellant's statement was that his entire encounter with prostitutes had been fully consensual and based on his agreement to pay for their services.

Victoria told a very different story. While she at first agreed to go with appellant for sexual activity, she soon became frightened, changed her mind and told appellant to let her out of the car. He told her no, took her to his apartment, threatened her if she did not call him a pedophile and then grabbed her by the neck and threw her into his apartment. Victoria was afraid and believed appellant was going to kill her. As the sexual encounter began, appellant urinated in Victoria's mouth and later struck her twice with a paddle. Victoria's testimony was that she was raped and forced to engage against her will in other sex acts.

Appellant stated he had never raped anyone. If his statements to the officer were believed, the encounter with Victoria was consensual. If Victoria's testimony was believed, she was raped. There was no basis for a *Mayberry* instruction with regard to the charges related to Victoria.

(Lodgment No. 9, People v. Vitale, No. D046393, slip op. at 17-18.)

Clearly established federal law provides that federal habeas relief is not available for an alleged error in the interpretation or application of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Rather, in order to merit federal habeas relief regarding the alleged instructional error, Petitioner must show the instructional error "so infected the entire trial that the resulting conviction violates due process." Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Where failure to give an instruction is in issue, the burden on the petitioner is "especially heavy." Kibbe, 431 U.S. 154. Moreover, even if the trial court's failure to give the instruction violated due process, habeas relief would still not be available unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); California v. Roy, 519 U.S. 2, 5 (1996).

Petitioner has failed to carry his "especially heavy" burden of demonstrating that the failure to give the requested instruction violated due process. Petitioner contends this is a classic

08cv0331

situation for giving a mistake of consent instruction because the testimony of the victims was unclear whether they communicated their withdrawal of consent to Petitioner.  However, as set forth above, Victoria S. clearly indicated to Petitioner that she did not want to go with him, and that she attempted to exit his vehicle but was prevented from doing so by Petitioner entering the freeway.  Although she had another chance to escape when Petitioner walked up to the ATM, she was in an unfamiliar neighborhood, was frightened of Petitioner, thought he could catch her and overpower her if she ran, and testified that she did not want to "risk it."  Even assuming her failure to escape could lead a reasonable person to believe she had not withdrawn her consent to have paid sex with Petitioner, the situation changed dramatically when they entered the apartment.  It is clear from Victoria's testimony that she immediately objected to the type of sex acts Petitioner performed on her, such as urinating in her mouth, and that she communicated her objections to Petitioner by saying that she could not handle it.  Victoria's testimony establishes that she submitted to the act of intercourse while being choked by Petitioner's hand on her throat, submitted to oral sex when her head was forced towards Petitioner crotch with Petitioner's hand on the back of her head causing her to vomit, and that all the sex acts occurred under threat of injury.  Margaret W. testified that she did not agree to have sex with Petitioner at all, merely to paddle him, and that as soon as they were in Petitioner's condominium he told her he was a police officer and she could either submit to sex or go to jail.  Moreover, neither victim was ever paid, further undermining Petitioner's contention that he had a reasonable belief they consented to have paid sex.

Petitioner's statement to Detective Vile, which was heard by the jury, showed that Petitioner believed the encounters were undoubtedly consensual.  Petitioner repeatedly told Detective Vile, in direct contradiction to the testimony of the victims, that her had never raped anyone, never forced anyone to have sex with him and was not worried that the police were investigating the allegations of rape because he had done nothing wrong.  (CT 169, 171-72, 181-84, 198-200, 214-16, 219, 231-34.)  Petitioner said that he had picked up hundreds of prostitutes in his lifetime, that he ended up not having sex with many of them, and, again in direct contradiction to both victims' testimony, that the first thing he asks a prostitute is how old they

are and if they say they are under eighteen he kicks them out of his car.  (CT 169-71, 178-80, 212.)  Petitioner said he believed that Margaret had accused him of rape because she was unhappy with how much she had been paid, and because he was not willing to drive her back to El Cajon Boulevard.  (CT 177.)  However, he also said he did not pay any money to either victim.  (CT 185, 211.)  He denied asking either victim to call him a pedophile, denied paddling either victim, and denied urinating in Victoria's mouth or causing her to throw up.  (CT 187, 199-200, 211, 227.)  He said Margaret tore her own clothes before running out of his apartment and that he never grabbed her in a hard manner, and said that Victoria initially agreed they would have sex without Petitioner wearing a condom, but later decided to accuse him of rape because afterward she became upset that he did not wear a condom.  (CT 193-95.)  Although the victims said they had never met each other, Petitioner opined that the victims knew each other and were conspiring to get him into trouble because they were unhappy with how their encounters had turned out, or perhaps because they had found out that on other occasions he had duped prostitutes by telling them that he is a reporter for the police and had influence enough to cause the police to leave them alone.  (CT 216, 234-35, 238-39, 241-43.)

The appellate court was correct in its determination that the stark contrast between the descriptions of the encounters given by the victims and Petitioner did not support giving an instruction that Petitioner may have had a good faith but mistaken belief that the victims consented to the sex acts.  Petitioner described the encounters as ordinary prostitution activities, after which the women decided to accuse him of rape for reasons of which he could only speculate.  He denied that he urinated on the victims, used any amount of force or engaged in sex acts which were not agreed upon.  The victims testified that they submitted to the sex acts under threat of arrest or a fear of violence based on what Petitioner had told them.  Petitioner has failed to carry his heavy burden of demonstrating that the failure to instruct the jury that he might have had a mistaken belief the victims consented to the acts, many of which he denied took place, violated his due process rights.

Even assuming a due process violation occurred as a result of the failure to give the requested instruction, it is clear that any error was harmless.  As there was no basis for a jury to

find that Petitioner had an honest but mistaken belief the victims consented to the sex acts, any error in failing to instruct the jury that they could make such a finding could not have had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637; <u>Roy</u>, 519 U.S. at 5.

Accordingly, the Court finds that the state court's adjudication of claim two was neither contrary to, nor involved an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. The Court therefore recommends habeas relief be denied as to claim two.

**D.      Petitioner is not entitled to habeas relief with respect to claim three.**

Petitioner contends in claim three that his Fourteenth Amendment right to due process and a fair trial were violated by the introduction of the videotape of the sexual encounter in Thailand. (Pet. at 7-8; Pet. Mem. at 19-25.) Specifically, Petitioner contends the videotape was not admissible under California law because there was no evidence that the activities depicted on the videotape were unlawful, and because it was irrelevant to the issue of consent. (Pet. Mem. at 21-22.)

Respondent contends that Petitioner's contention that the videotape was inadmissible under California law does not present a claim cognizable on federal habeas, and is in any case without merit. (Ans. Mem. at 17-19.) Respondent contends that there is no clearly established federal law which holds that due process is violated by introduction of evidence regarding other crimes, and that even assuming an error occurred, it was harmless. (<u>Id.</u> at 19-20.) Petitioner replies that any error could not be harmless because the jury was not properly instructed regarding their use of the videotape and because the highly inflammatory nature of the acts depicted on the videotape prejudiced Petitioner when considered in light of the weak evidence supporting the forcible rape and oral copulation charges. (Traverse at 12-14.)

Petitioner presented claim three to the state supreme court in a petition for review. (Lodgment No. 12.) That petition was denied by an order which stated: "Petition for review DENIED." (Lodgment No. 13, <u>People v. Vitale</u>, No. S146674 (Cal. Nov. 29, 2006).) He

presented the same claim on direct appeal. (Lodgment Nos. 3-5.)  The appellate court, in an

unpublished opinion, affirmed the judgment of conviction. (Lodgment No. 9, <u>People v. Vitale</u>,

No. D046393 (Cal.Ct.App. Aug. 16, 2006).)

The Court will look through the silent denial by the state supreme court to the last

reasoned state court opinion.  The appellate court denied the due process claim, stating:

> Appellant argues the admission of evidence pursuant to Evidence Code
> section 1108 denied him due process in that it admits highly prejudicial evidence
> and reduces the prosecution burden of proof.  Our Supreme Court has held the
> section does not have these effects and does not deny due process.  (*People v.*
> *Falsetta* (1999) 21 Cal.4th 903, 916-922.)

(Lodgment No. 9, <u>People v. Vitale</u>, No. D046393, slip op. at 17-18.)

In <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991), the defendant was convicted of second-degree

murder in the killing of his infant daughter, and objected to the introduction of evidence of

battered child syndrome, including evidence of previous injuries to the victim, arguing that the

manner in which the jury was instructed allowed them to use the evidence as propensity

evidence.  <u>Id.</u> at 67.   The Supreme Court first found that an inquiry into whether the evidence

was "incorrectly admitted pursuant to California law . . . is no part of a federal court's habeas

review of a state conviction."  <u>Id.</u>  The Court next found that the evidence was relevant to an

issue at trial (intent), and stated that "nothing in the Due Process Clause of the Fourteenth

Amendment requires the State to refrain from introducing relevant evidence simply because the

defense chooses not to contest the point."  <u>Id.</u> at 70.  Finally, the Court recognized that a jury

instruction can rise to the level of a federal due process violation if the instruction "so infected

the entire trial that the resulting conviction violates due process."  <u>Id.</u> at 72.  The Court rejected

the defendant's argument that the instruction at issue amounted to a "propensity" instruction, that

is, one allowing the jury to base its decision in part upon the conclusion that the defendant

committed the prior acts and therefore had a propensity to commit that type of crime, finding

there was no reasonable likelihood the jury used the instruction in that manner.  <u>Id.</u> at 74-75.

The Court then stated in a footnote that:  "Because we need not reach the issue, we express no

opinion on whether a state law would violate the Due Process Clause if it permitted the use of

'prior crimes' evidence to show propensity to commit a charged crime."  <u>Id.</u> at 75 n.5.

-30-                                    08cv0331

1    The Ninth Circuit has in the past interpreted the holding of <u>McGuire</u> as providing that a
2  federal habeas petitioner can establish a federal due process violation by showing that a state
3  court's improper evidentiary rulings regarding admissibility of evidence were so prejudicial that
4  they rendered his trial fundamentally unfair.  <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 897 (9th
5  Cir. 1996); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).  Recently, in <u>Alberni</u>
6  <u>v. McDaniel</u>, 458 F.3d 860 (9th Cir. 2006), the Ninth Circuit recognized that every circuit, in
7  cases decided before AEDPA was enacted, had found that improper introduction of evidence
8  may violate federal due process if it renders a trial fundamentally unfair.  <u>Id.</u> at 865-66.
9  However, the <u>Alberni</u> Court held that the fact that the Supreme Court in <u>McGuire</u> specifically
10  reserved ruling on the issue regarding whether introduction of propensity evidence can give rise
11  to a federal due process violation, and has denied certiorari at least four times on the issue since
12  <u>McGuire</u> was decided, the right asserted "has not been clearly established by the Supreme Court,
13  as required by AEDPA."  <u>Id.</u> at 867.

14    Thus, to the extent Petitioner contends that the state courts erred in ruling that evidence
15  was admissible under California law, such a claim is not cognizable on federal habeas.
16  <u>McGuire</u>, 502 U.S. at 67.  With respect to Petitioner's claim that introduction of the evidence
17  was a violation of federal due process because it unfairly permitted the jury to find that he had
18  a propensity to commit crimes similar to the ones with which he was charged, the state court's
19  adjudication of the claim was neither contrary to, nor involved an unreasonable application of,
20  clearly established federal law.  <u>Alberni</u>, 458 F.3d at 867; <u>Williams</u>, 529 U.S. at 412.  The Court
21  recommends denying habeas relief as to claim three.

## VI.

## <u>CONCLUSION AND RECOMMENDATION</u>

24    For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court
25  issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing
26  that judgement be entered denying the Petition.

27  / / /
28  / / /

1    **IT IS ORDERED** that no later than ***July 30, 2008*** any party to this action may file

2    written objections with the Court and serve a copy on all parties.  The document should be

3    captioned "Objections to Report and Recommendation."

4    **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

5    Court and served on all parties no later than ***August 20, 2008***.  The parties are advised

6    that failure to file objections with the specified time may waive the right to raise those

7    objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir.

8    1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

9
     DATED:  July 2, 2008
10

11   _____

12   Hon. William McCurine, Jr.
     U.S. Magistrate Judge
13   United States District Court

14
     CC:        HON. JANIS L. SAMMARTINO
15              ALL PARTIES

16

17

18

19

20

21

22

23

24

25

26

27

28